1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

John H. Bradley (Wisconsin Bar No. 1053124)
R. Rick Resch (Wisconsin Bar No. 1117722)
**STRANG BRADLEY, LLC**
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

Estate of Richard Lee Richards

by Special Administrator Victoria

Richards,

    *Plaintiff,*

    *v.*

Ryan T. Remington and

City of Tucson,

    *Defendants.*

CIVIL RIGHTS COMPLAINT

*Jury Trial Demanded Under*
*Fed. R. Civ. P. 38(b)*

The Estate of Richard Lee Richards by Special Administrator Victoria Richards, by its attorneys, Strang Bradley, LLC, for its complaint against Defendants states:

**INTRODUCTION**

1.       On 29 November 2021, former Tucson Police Department Officer Ryan Remington stood approximately five feet behind Richard Lee Richards as Richards sat in his wheelchair. Remington fired nine shots at Richards, hitting him in the back and arm eight times and ultimately killing him.

2.       Before Remington fired any shots, the following facts were true and known to Remington: (a) Richards had discarded in a parking lot, in view of Remington, the toolset that he had taken from Walmart; (b) Richards was confined to a battery powered wheelchair with a maximum speed not much faster than an ordinary walking pace; and (c) Remington had kept pace with Richards for several minutes as they traveled across parking lots in a shopping center.

3.       After Remington fired the first eight shots, he paused. The following facts were true in that moment: (a) Richards was no longer moving forward, his wheelchair was stopped; (b) Richards had dropped the knife he had and was unarmed; (c) Richards was hunched over from the seven hollow point bullets that had torn into his body; (d) Richards was not a threat to anyone and a Lowe's store clerk had fled the scene because of Remington's battery of shots in her direction; (e) the immobilized Richards, Remington, and another officer were the only people in the area; and (f) the other officer, Officer Taylor, had arrived on the scene as backup with non-lethal police tools including a billy club, Taser, and her department-required pepper spray.

4.       After he paused, on the above facts, Remington fired a ninth shot into Richards body anyway.

5.       That Remington fired the first eight shots at the back of Richards as he sat there confined in his wheelchair was unconscionable and disturbing. But the pause after the eighth shot, followed by the ninth shot, evidences Remington's depraved state of mind and ought to shock the conscience of all human beings.

6.      This walking encounter with Richards began because Walmart suspected Richards of shoplifting a toolset.

7.      Richards displayed a knife in response to a Walmart employee asking Richards if he had a receipt but threatened no harm to Remington or anyone else. Richards then abandoned the toolset on the ground as the walking encounter through the parking lots continued.

8.      Remington never warned Richards that he was going to shoot him. He never used and never even drew his Taser. He never used any non-lethal force despite having several minutes to do so. And that day he failed to have his pepper spray with him, which he was required to carry by Tucson Police Department policy.

9.      After Remington shot Richards, his near-lifeless body fell forward out of his wheelchair onto the pavement. As Richards lay dying, Remington rushed to him and spent the next twenty seconds moving Richards's limp arms and handcuffing Richards's hands behind his back instead of attempting to save his life or render any first aid.

10.     Richards did not present any imminent threat to anyone at the time Remington killed him. There was no need or good reason to shoot Richards. Before killing Richards, Remington walked slowly next to Richards for six minutes across two parking lots and a street, often within arms' reach of him, while he calmly spoke over this radio to dispatch and other officers.

11.     The day after Remington killed Richards, Tucson Police Chief Chris Magnus said, "I am deeply troubled by Officer Remington's actions. His use of deadly force in this incident is a clear violation of department policy and directly contradicts multiple aspects of our use of force training. As a result, the department moved earlier today to terminate Officer Remington." The day after Remington killed Richards, Tucson Mayor Regina Romero said in a statement that Remington's actions were "unconscionable and indefensible."

12.     Just as he said, the day after the shooting Chief Magnus moved to fire Remington for violating department policy by shooting and killing Richards. Remington was eventually fired, but he has moved to appeal the decision to fire him. Implicit in Remington's appeal to get his job back is that he thinks he should be trusted by the Tucson community to exercise good judgement and return to the streets as an armed police officer—despite the police chief's contrary conclusion.

13.     This lawsuit seeks to achieve a measure of justice for Richard Lee Richards and his survivors by establishing the obvious: An officer cannot shoot in the back and kill a slow-moving shoplifting suspect in a wheelchair, without warning, when no one is in imminent danger.

14.     This is a lawsuit for money damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Richard Lee Richards's constitutional right to be free from unreasonable seizure in violation of the Fourth Amendment of the United States Constitution. The Constitutional violation at issue is the use of excessive force in the seizure of Mr. Richards: that force being eight hollow point bullets shot into his back at close distance by a former Tucson Police Department Officer Remington.

15.     This lawsuit also brings claims against the City of Tucson and Ryan Remington under the American with Disabilities Act, under the Rehabilitation Act, and under Arizona state law.

16.     Justice requires that Remington be held accountable for shooting eight shots into Richards's body and killing him. Punitive damages are necessary to punish Remington for firing the first eight shots and especially for firing the ninth shot.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and § 1343(a)(3) (42 U.S.C. §1983 jurisdiction).

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal law claims that they form part of the same case or controversy.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims asserted herein occurred within this judicial district. And Defendant Remington lives in this district.

**PARTIES**

20.     Plaintiff, the Estate of Richard Lee Richards, is a legal entity with the capacity to sue and be sued.

21.     Plaintiff, Victoria Richards is the duly appointed Special Administrator of the Estate of Richard Lee Richards by the Pima County Superior Court under the laws of the State of Arizona. Victoria Richards brings this action on behalf of the estate and all statutory beneficiaries of the estate.

22.     Defendant City of Tucson is a municipal corporation and governmental entity organized under the laws of the State of Arizona.

23.     Defendant Ryan Remington was, at the time of this occurrence, employed as police officer in the Tucson Police Department. At all times relevant to this action, Defendant Remington engaged in the conduct complained of while he was a duly appointed and sworn police officer and was acting in his individual capacity, under color of state law, and within the scope of his employment with the City of Tucson. Remington is sued in his individual capacity.

**FACTS**

24.     On 29 November 2021, former Tucson Police Department Officer Ryan Remington killed Richard Lee Richards by shooting him in the back and arm eight times while Richards was sitting in a battery powered wheelchair.

25.     Remington was working as a City of Tucson Police Officer on a special duty assignment to provide security guard services for a Walmart located at 1650 W. Valencia Road in Tucson, Arizona.

26.     At 5:49 p.m. Richards exited the Walmart in his battery powered wheelchair along with a toolset on his wheelchair.

27.     A Walmart employee noticed Richards exiting the store with the toolset and believed that Richards had not paid for it.

28.     The Walmart employee approached Richards and asked him if he had a receipt, but according to the Walmart employee Richards ignored him and continued to exit the store.

29.     The Walmart employee went back inside the store to the security office and knocked on the door.

30.     Remington was sitting in the security office with other Walmart employees.

31.     When the door opened, the Walmart employee said to Remington, "Can you help me out here? I think [] this guy is trying to [] steal something." Remington then followed the Walmart employee out to the parking lot where they approached Richards, who was still sitting in his battery powered wheelchair.

32.     According to the Walmart employee, when he was back outside in the parking lot alongside Remington, Richards "eventually stopped and, and I said [] sir [] can I see your receipt please" and Richards responded by saying "here's my receipt" and pulled out a knife. The Walmart employee said that Richards did not make any direct threats to him, and that he believed that Richards was "eventually gonna point it towards me."

33.     Remington, who was standing next to Richards's wheelchair, pulled out his pistol and radioed dispatch. The Walmart employee left and went back inside the Walmart store to keep working.

34.     Richards continued to slowly move away from Remington in his battery powered wheelchair. Remington walked along with Richards for about six minutes, from the Walmart parking lot to the entrance of the garden center of a Lowe's store. On their route, they went through the parking lot in front of the Walmart store and five other storefronts, across the three-lane South Oak Tree Drive, and into the parking lot in front of the Lowe's store. The total distance was about a third of a mile.

35.     Richards remained seated in his wheelchair for the entire duration of his contact with the Walmart employee and Remington. Richards was sitting in a used Merits Health P301 Gemini Power Wheelchair, which according to the manufacturer specifications, has a maximum speed of five miles per hour and a maximum ground clearance of four inches.

36.     While Remington was walking alongside Richards in the Walmart Parking area, Richards discarded the toolset in the parking lot, and Walmart employees picked it up and took it back inside the Walmart store.

37.     While Remington was walking alongside Richards, he was actively communicating on the radio with the dispatch operator, a sergeant, and two other officers. Remington's voice, in talking over his radio, was calm and collected. In those communications, it was broadcasted on three occasions that Officer Gastelum had and was on his way with a less lethal rubber bullet shotgun. Remington specifically acknowledged, "Bravo 18 copy" in response to Gastelum's advisement that he was responding with a Flex—a less lethal rubber bullet shotgun. Remington also knew that five additional units and a supervisor were responding to his location as it was broadcasted over the radio prior to the shooting. Based on his communication with fellow officers and radio broadcasts and on his training and experience, Remington should have reasonably concluded that he had additional personnel en route and less lethal tools available in the form of a less lethal rubber bullet shotgun, Tasers, batons, and pepper spray.

38.     Remington was wearing his Tucson Police Department police uniform badge and equipment, including his Tucson Police Department issued bulletproof vest, pistol, and Taser. Although Tucson Police Department policies required Remington to carry his Tucson Police Department issued pepper spray with him, he did not have it that day.

39.     As Richards and Remington were reaching the Lowe's Garden Center area, Tucson Police Department Officer Stephanie Taylor arrived in her squad car.

40.     Taylor exited her squad car with her body worn camera recording and approached Richards and Remington. Taylor had her Tucson Police Department issued pistol, billy club, Taser, and pepper spray with her.

41.     Taylor reported that as Remington and Richards approached the entrance to the Lowe's Garden Center, Remington was walking parallel to Richards, about 10–12 feet away from him

42.     Both Remington and Taylor had their department issued Taser 7s with them as they approached Richards. Axon Taser 7s are marketed as being optimized for close-range deployments. Specifically, Taser 7s can be used with two types of cartridges—12-degree cartridges that are designed to shoot someone as close as four feet away and 3.5-degree cartridges that are designed to shoot someone as close as 11.5 feet away.

43.     Remington later claimed, through his lawyer, that he was too close to Richards to tase him. However, the video demonstrates that Remington was capable of walking and positioning himself at any angle and any distance from Richards, who was confined to his wheelchair

44.     As they approached the entrance to the Lowe's Garden Center, Remington told Richards "Do not go into the store, sir."

45.     Remington did not use or attempt to use his Taser. In fact, Remington did not ever draw his Taser at any point during his encounter with Richards.

46.    Remington did not use or attempt to use any other less lethal police tool at any point during his encounter with Richards.

47.    Remington did not attempt to move in front of Richards or increase his distance in relation to Richards to put himself in a better position to use his Taser.

48.    Remington's lawyer would later say that, along with Remington's positioning, Remington couldn't use his Taser on Richards from behind "[be]cause of the wheelchair."

49.    Remington did not warn Richards that he was going to shoot him.

50.    Remington then walked up so that he was approximately five feet from Richards sitting in his wheelchair and shot him in the back eight times.

51.    After Remington shot Richards and Richards fell headfirst out of his wheelchair, his body was motionless on the ground and bleeding profusely. As Richards lay dying, Remington spent the next twenty seconds moving Richards's limp arms and handcuffing Richards's hands behind his back instead of attempting to save his life or render any first aid

52.    Tucson Police Department Officer Gastelum arrived with a less lethal rubber bullet shotgun, also known as a Flex, within seconds of the shooting. He arrived before Remington had even finished handcuffing Richards's hands behind his back. Gastelum assisted Remington in handcuffing Richards's hands behind his back.

53.    The Pima County Medical Examiner conducted an autopsy of Richards on 1 December 2021 and concluded that Richards had been shot five times in the back and three times in the left arm. The medical examiner concluded that Richards died by homicide.

54.    Remington fired nine hollow point bullets at Richards, but only hit Richards with eight bullets. One of the nine rounds missed Richards entirely and went on to strike an object inside the Garden Center. One of the rounds that hit

Richards penetrated and exited his body and continued to strike another object in the Garden Center entrance area.

55.     Remington's first eight shots were fired in rapid succession all within just over two seconds. Remington then paused for over a second and fired a final shot into Richards.

56.     Later that same evening Tucson Police Department began a criminal homicide/murder investigation into Remington for killing Richards.

57.     Remington's lawyer would later say that Remington intended to kill Richards.

58.     The day after the killing, Tucson Police Chief Chris Magnus said, "I am deeply troubled by Officer Remington's actions. His use of deadly force in this incident is a clear violation of department policy and directly contradicts multiple aspects of our use of force training. As a result, the department moved earlier today to terminate Officer Remington."

59.     The day after Remington killed Richards, Tucson Mayor Regina Romero said in a statement that Remington's actions were "unconscionable and indefensible."

60.     On 24 August 2022, Remington was indicted on charges of felony manslaughter for killing Richards.

61.     Tucson Police Department general policy on the use of force states, "it is the sworn duty of every officer to safeguard and protect human life" and that if the use of force becomes necessary, officers shall use the force proportionate to the threat. "Deadly force is authorized when an officer reasonably perceives an imminent threat of serious physical injury or death to the officer or another person. Deadly force is a measure to be employed only in the most extreme circumstances when less-deadly means of force have failed or could not reasonably be employed."

62.     Remington did not need to defend himself or any other person at the time he shot Richards. Richards did not pose an imminent threat of death or serious bodily injury to anyone. Richards's actions showed that his goal was evasion. Richards did not make any threatening comments towards Remington or the Lowe's clerk. Richards made no deliberate or overt action or movement to indicate that he posed an imminent threat of death or serious bodily injury to anyone. Richards did not get up, lunge at, or make any overt movement indicating that he was about to physically attack anyone.

63.     Shortly after the shooting, Remington told a Tucson Police Department Sergeant that he shot Richards because he felt that Richards was a threat to the Lowe's store clerk who was sitting on a stool inside the garden center.

64.     To the extent that Remington perceived that Richards was a threat to the Lowe's clerk, his perception was unreasonable under the circumstances. Richards did not attempt to get up from the wheelchair or make any attempt, threat, or overt actions toward the Lowe's clerk.

65.     Additionally, Remington's claim that he shot Richards to protect the Lowe's clerk is unreasonable because he saw where she was sitting, on a stool in the garden center, and she was in his line of fire at the time he shot Richards. By shooting Richards with the Lowe's clerk in his line of fire, Remington's actions placed the Lowe's clerk at a far greater risk of death or injury than any risk he perceived was presented by Richards in his wheelchair.

66.     Remington's additional justification for shooting Richards to protect people in the Lowe's Garden Center generally is also unreasonable. According to the on-duty manager at Lowe's at the time of the shooting, aside from the one clerk in Remington's line of fire, there was "approximately one customer in the Garden Center." Further, Remington easily could have closed either the metal gate or the chain link doors to the Lowe's Garden Center, as both were near him. And,

obviously, Remington could have used non-lethal force, like his Taser, instead of immediately and without warning resorting to using his pistol.

67.     A forensic analysis of the video and photos of the shooting concluded that Richards's wheelchair was no longer in a forward motion at the time Remington fired shots six, seven, eight, and nine and that the knife was not in Richards's hand when shot nine was fired.

68.     Remington had just spent the past six minutes walking alongside Richards, within arms' reach for much of the time, across several parking lots. At no point during Remington's frequent contact with dispatch did Remington say he feared for his safety or thought that Richards was a threat.

69.     At no point during Remington's encounter with Richards did Remington pull out his Taser or attempt to employ any less lethal option despite having ample opportunity to do so.

70.     City of Tucson Police Department General Order 3722.1 requires all officers to carry their department issued pepper spray with them while in uniform and working on special duty assignments. However, Remington did not have his pepper spray the day he shot Richards.

71.     Based upon the facts and the totality of the circumstances known to Remington at the time he shot Richards, an officer of similar training and experience would not have shot Richards. Had Remington been acting reasonably, he would have concluded that Richards was not a threat of serious bodily injury or death to anyone, especially after the eighth shot.

72.     Remington's use of deadly force by firing nine shots at Richards was unnecessary. The deadly force Remington used was disproportionate to the force needed to arrest Richards, was objectively unreasonable, and was completely avoidable.

73.     The ninth and final round fired was fired after a pause in which Remington could reassess his perception of whether imminent danger existed.

There was no imminent threat of death or serious bodily injury to anyone at that point. Just prior to the ninth round being fired, Richards was slumping over and nearly fallen from his wheelchair. An officer with similar training and experience would have assessed that the last and final round, like the first eight rounds, was unnecessary and unreasonably fired.

74.     Justice requires that Remington be held accountable for shooting eight shots into Richards's body and killing him. Punitive damages are necessary to punish Remington for firing the first eight shots and especially for firing the ninth shot.

## COUNT I

**42 U.S.C. § 1983, Excessive Force Claim Against Remington**

75.     Plaintiff realleges the above paragraphs.

76.     The intentional actions of Defendant Remington in shooting Richards eight times while he was confined to a wheelchair was excessive, deadly, unjustifiable, and unnecessary force against Plaintiff and violated Plaintiff's Fourth Amendment right to be free from unreasonable arrest and seizure, under clearly established law, and thus violated 42 U.S.C. § 1983.

77.     Defendant Remington did not reasonably fear imminent bodily harm of anyone when he shot Richards.

78.     Defendant Remington's use of deadly force in shooting Richards eight times was objectively unreasonable and violated clearly established law.

79.     Any reasonable officer would have known that shooting a wheelchair bound person in the back eight times under these circumstances constitutes excessive force in violation of the Fourth Amendment and clearly established law.

80.     Defendant Remington acted recklessly and/or with callous indifference to the federally protected rights of Plaintiff.

13

81.     As a direct and proximate result of Remington's unlawful actions, Richard Richard's constitutional rights were violated and Plaintiff has suffered, and will continue to suffer damages, including economic loss to Richards's estate.

## COUNT II

**42 U.S.C. §§ 12111–213, Title II of the**

**Americans with Disabilities Act ("ADA") Claim Against City of Tucson**

82.     Plaintiff realleges the above paragraphs.

83.     Richards is a qualified person under the ADA because he had a disability.

84.     Richards was disabled in that he suffered from a broken hip and was confined to and reliant on a wheelchair for normal mobility and transportation.

85.     Richards's disabilities substantially limited his major life activities, including normal movement, physical activities, transportation, interacting with others, and caring for himself.

86.     Richards was regarded as disabled because he relied on a motorized wheelchair.

87.     The City of Tucson failed to reasonably accommodate Richards or discriminated against Richards by failing and refusing to reasonably modify and accommodate police department policies, practices and procedures regarding its operations and services for Richards, which would include training deputies to interact appropriately with individuals using wheelchairs and other mobility aids, and failing and refusing to adopt a policy to protect the safety and well-being of people like Richards, or other persons who use wheelchairs or mobility aids.

88.     The City of Tucson failed to conduct a self-evaluation plan under the ADA, and then failed to modify its programs and services to accommodate the

needs of persons with physical disabilities, such as Richards, when called upon to provide service.

89. The City of Tucson's failure to reasonably accommodate Richards or their discrimination against Richards because of his disability effectively denied Richards's access to programs and services of the City of Tucson. Richards had the right to be arrested without being humiliated or killed because of his disability.

90. Remington failed to reasonably accommodate Richards during his arrest of Richards. Remington's decision to use his gun instead of hi Taser was made because Richards was in a wheelchair. Remington should have reasonably accommodated Richards by using an alternative non-lethal use of force in seizing Richards, rather than killing him or Remington should have moved into a position that would have allowed him to use his Taser. Remington also had the time and opportunity to assess the situation and deescalate or use non-lethal force.

91. Remington's lawyer has said that one of the reasons Remington didn't use his Taser on Richards was "[be]cause of the wheelchair."

92. Because Remington failed to accommodate Richards's disability in the course of his investigation and arrest of Richards, Richards suffered greater injury and indignity than other arrestees would have in had in the same situation.

## COUNT III

### 29 U.S.C. §§ 794–94e, Rehabilitation Act Claim Against City of Tucson

93. Plaintiff realleges the above paragraphs.

94. Richards is a qualified person under the Rehabilitation Act because he had a disability.

95. Richards was disabled in that he suffered from a broken hip and was confined to and reliant on a wheelchair for normal mobility and transportation.

96.     Richards's disabilities substantially limited his major life activities, including normal movement, physical activities, transportation, interacting with others, and caring for himself.

97.     The City of Tucson failed to reasonably accommodate Richards or discriminated against Richards by failing and refusing to reasonably modify and accommodate police department policies, practices and procedures regarding its operations and services for Richards, which would include training deputies to interact appropriately with individuals using wheelchairs and other mobility aids, and failing and refusing to adopt a policy to protect the safety and well-being of people like Richards, or other persons who use wheelchairs or mobility aids.

98.     The City of Tucson failed to conduct a self-evaluation plan under Section 504, and then failed to modify its programs and services to accommodate the needs of persons with physical disabilities, such as Richards, when called upon to provide service.

99.     The City of Tucson's failure to reasonably accommodate Richards or their discrimination against Richards because of his disability effectively denied Richards's access to programs and services of the City of Tucson.

100.     Remington failed to reasonably accommodate Richards during his arrest of Richards. Remington's decision to use his gun instead of hi Taser was made because Richards was in a wheelchair. Remington should have reasonably accommodated Richards by using an alternative non-lethal use of force in seizing Richards, rather than killing him or Remington should have moved into a position that would have allowed him to use his Taser. Remington also had the time and opportunity to assess the situation and deescalate or use non-lethal force.

101.     Remington's lawyer has said that one of the reasons Remington didn't use his Taser on Richards was "[be]cause of the wheelchair."

16

102.    Because Remington failed to accommodate Richards's disability in the course of his investigation and arrest of Richards, Richards suffered greater injury and indignity than other arrestees would have in had in the same situation.

### COUNT IV

### A.R.S. § 12-611, Wrongful Death Claim

103.    Plaintiff realleges the above paragraphs.

104.    Remington caused Richard's death by means of intentionally shooting him in the back eight times.

105.    The intentional actions of Remington in shooting Richards eight times while he was confined to a wheelchair was excessive, unjustifiable, and unnecessary force against Richards.

106.    As a direct result of Remington's wrongful act of shooting Richards in the back eight times, Richards was killed, and Plaintiff and all statutory beneficiaries of Richards's estate sustained damages.

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants and in favor of Plaintiff as follows:

a)    For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

b)    For punitive and exemplary damages against Defendant Remington in an amount appropriate to punish the wrongful conduct of Remington as alleged in this complaint and to deter such conduct in the future by Remington and others;

c)    For pre- and post-judgment interest to the extent provided by law;

d)    For attorney fees and litigation and court costs as permitted by 42 U.S.C. § 1988 and as otherwise authorized by all other applicable law; and

e)    For such other relief as this Court may deem just and proper.

**Jury Demand**

Plaintiff hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38(b), on all issues so triable.

Respectfully submitted,

Dated: September 19, 2022

/s/ John H. Bradley
John H. Bradley
   Wisconsin Bar No. 1053124
R. Rick Resch
   Wisconsin Bar No. 1117722
STRANG BRADLEY, LLC
613 Williamson Street, Suite 204
Madison, WI 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com

Counsel for Plaintiff

18