**HUMPHREY & PETERSEN, P.C.**
6063 E. GRANT ROAD
TUCSON, ARIZONA  85712
TELEPHONE: 520-795-1900

8048-1

Andrew J. Petersen, State Bar No. 016699
APetersen@humphreyandpetersen.com
Attorney for Defendant Ryan T. Remington

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Estate of Richard Lee Richards by Special Administrator Victoria Richards,<br><br>Plaintiffs,<br><br>vs.<br><br>Ryan T. Remington and City of Tucson,<br><br>Defendants. | Case No.:  4:22-cv-00429-JGZ<br><br>**MOTION FOR SUMMARY JUDGMENT**<br><br>(*Oral Argument Requested*)<br><br>(Hon. Jennifer G. Zipps) |

Defendant Ryan Remington moves for summary judgment pursuant to Rule 56(a).

**1. Factual Background**

On November 29, 2021, at approximately 6 pm, Walmart employee David Louie observed a man, later identified as Richard Richards, leaving the store in his electric scooter and setting off the store merchandise alarm. (SOF 1) Mr. Louie saw unpaid merchandise in the scooter, and he asked to see Richards' receipt. (SOF 2) Richards ignored him and continued into the parking lot. (SOF 3) Mr. Louie went to the security

1

office and told Tucson Police Department Officer Ryan Remington. (SOF 4) Officer Remington was working as off-duty security. (SOF 5) Officer Remington followed Mr. Louie as he went out to the parking lot to find Richards. (SOF 6) Mr. Louie caught up with Richards and again asked for a receipt:

> So I went out to the parking lot to – to find the man later identified as Richards, and I caught up to him. You know, I said, Sir, do you have your receipt please. You know, I was completely polite and respectful in my interactions with Richards at all times. I was not confrontational at all with Richards, you know. I – I politely asked for his receipt, you know, out in the parking lot. . . . And when I asked Richards, Sir, I need to see your receipt, Richards took out a knife, right, and he – and Richards pointed the knife directly at me and Richards said to me in a threatening manner, Well, here is my receipt, that's when Officer Remington stepped in, you know. Officer Remington, you know, he pulled out his gun and he asked Richards to drop the knife and from my perspective, it seemed to me that Remington was doing the best he can to deescalate the situation you know.
>
> He was – Remington seemed to be trying to get Richards to peacefully comply with this order to drop the knife, right.  Like I think from my perspective. Remington tried to do whatever he can to deescalate the situation peacefully.
>
> But you know, Richards wouldn't drop the knife, and I was right there – I was right there and I was directly there and I directly saw it with my own eyes and heard it with my ears, Richards said to Remington, The only way I am going to drop this knife is if you shoot me.  Yes, he did say that right in front of me.  The only way I'm going to drop this knife is if you shoot me.

(SOF 7) Mr. Louie testified when Richards pointed the knife directly at him in a threatening manner, he was in fear of his life. (SOF 8).  Mr. Louie did not know whether Richards was truly disabled, and "for all I know, he could have jumped out of that scooter and stabbed me." (SOF 9) Mr. Louie explained, "Remington intervened in a timely manner to stop Richards from stabbing me . . I credit Remington with saving my life that night." (SOF 10)

1    After Officer Remington intervened, Richards continued driving the scooter away
2 through the parking lot and headed towards an exit on the west side of the parking lot.
3 (SOF 11) Officer Remington followed Richards with his gun drawn and directed other
4 customers in the parking lot to move away. (SOF 12) Within seconds of his first
5 communication with dispatch, five additional officers were dispatched including a flex
6 baton and canine unit. (SOF 13) Richards exited the parking lot and went south on Oak
7 Tree Drive. (SOF 14) He then crossed Oak Tree Drive directly in front of a vehicle. (SOF
8 15) The vehicle stopped, and Richards continued but instead of continuing north on
9 Oakwood Street, Richards abruptly circled back and headed south towards the adjacent
10 Lowe's. (SOF 16) Throughout this time, Officer Remington trying to de-escalate the
11 situation and was telling Richards to stop and drop the knife. (SOF 17) Richards
12 continued making statements including: "It's not going to end without a fight. It's not
13 going to end well for either of us. Leave me alone." "TPD has taken too much from me. I
14 can't go back to prison. It's not going to end without a fight. You will have to kill me."
15 "It's not going to end without a fight. You will have to kill me. I'm not going back to
16 prison. You've already taken enough from me already."  Richards then dropped  the
17 stolen merchandise: "Go ahead, have it back. Leave me the fuck alone." Officer
18 Remington told him: "That's not going to solve the issue today. You need to stop, drop
19 the knife and come with me." Richards continued: "You're going to have to kill me or I'll
20 do it myself." "You're going to have to kill me. Leave me alone. Get out of my way. It's
21 not going to end well for either of us."  (SOF 18) Officer Remington continually told him

to stop, and Richards responded: "That's not going to happen today. It's not going to end other than you having to kill me and I'll make sure of it." (SOF 19)

Richards then drove his scooter from the back of Lowe's towards the front of the store, he then abruptly turned north and entered the Lowe's garden entrance towards a cashier. Officer Stephanie Wade arrived just as Richards turned north to go into the store. (SOF 21) Officer Remington told her "He's got his knife in his other hand." And, he told Richards "Do not go into the store, sir." Officer Wade also told him to "Stop now!" (SOF 22) Richards did not stop, or drop the knife. (SOF 23) He was holding the knife point up and driving towards a cashier standing just inside the entrance when Officer Remington fired nine shots at Richards over a three second period. (SOF 24) Officer Remington was approximately six to eight feet from Richards. (SOF 25) Richards was approximately twenty feet from the Lowe's cashier. (SOF 26)

**After-acquired evidence:**

After-acquired evidence is consistent with Officer Remington's statement and what Richards was telling Officer Remington while refusing to drop the knife. Post-incident investigation showed Richard Richards had illegal drugs in his system including heroin, cocaine, methamphetamine etc. (SOF 27) Mr. Richards was mobile and able to walk, although with some difficulty. (SOF 28)

It was learned Richards had previously been banned from Walmart on November 14, 2021, after he was seen stealing merchandise, pulled a knife on another employee, surrendered the stolen merchandise and left before law enforcement was called. (SOF 29)

It was learned that Richards spent most of his adult life in prison including a 1998 conviction for first degree attempted murder of peace officer Steve Huber and aggravated assault on another officer. (SOF 30) Attached as Exhibit L to Defendant's Statement of Facts is a timeline of his incarcerations. (SOF 31) For 34 of the last 40 years of his life, Richards was in state or federal prison. (SOF 32) His last release was on September 15, 2021, just a few months before this incident. (SOF 33)

Richards' sister Plaintiff Victoria Richards told Detective Gillespie that Richards was addicted to drugs including methamphetamine and heroin. (SOF 34) She did not know he was using an electric scooter or wheelchair when he was shot and initially wondered why the officer did not use a taser or shoot him in the leg. (SOF 35) Richards had mental health issues and problems with his hip after he fell while on a prisoner work crew. (SOF 36) She believed he had his hip replaced. (SOF 37) She believed "it would probably come to this kind of end, because he's just – he's just been an angry man from childhood. . ." (SOF 38) His biggest fear was going back to prison. (SOF 39) She last saw Richards three years before the shooting. She could not deal with him and "had to wash my hands of him." (SOF 40)

**2.  Defense experts Paul Patterson and Steve Ijames:**

Officer Remington retained two experts. Both concluded the use of deadly force was reasonable. Their detailed reports are attached to the Statement of Facts as Exhibits F and H.

1    Paul Patterson worked for the Tucson Police Department from 1991 to 2014. His service included working as a patrol officer, SWAT Team officer, and Training Coordinator. On policies, he concludes Officer Remington acted appropriately throughout the encounter and consistent with TPD General Orders 2020, 2041, 2050, and 2060 on use of force. An officer is not trained to disarm a knife wielding suspect by using a baton, using OC Spray or a TASER under these circumstances. Officer Remington acted consistent with his training. (SOF 41)

Steve Ijames is a nationally recognized expert on use of force. His conclusions include: "[A]t the moment he [Richards] turned towards the store entrance and a Lowes employee while armed with the knife, and refused orders to stop advancing, it would have been consistent with generally and accepted police training, policy, and practice, and consistent with that of a prudent, experienced, and professionally trained police officer facing these or similar circumstances, and consistent with the safety priorities outline above, to reasonably believe that Mr. Richards presented a significant threat of causing death of serious physical injury to that employee-and use deadly force to stop the threat reasonably perceived and presented." (SOF 42) Both experts were deposed and testified consistent with their reports. Paul Patterson was asked how the fact that Richards was in a wheelchair impacts the use of-force analysis:

> Well, it's certainly a factor in terms of mobility. But he is still mobile and he is still armed with a knife.
>
> And consistent with the manner in which Arizona Post trains edged-weapon threats, a knife does – is not dependent upon size, strength, or skill. It is a touch

> tool, that all somebody has to do is close enough to touch you with it to cause damage.
>
> So the fact that he's in a wheelchair is, in fact – or in a mobility scooter or wheelchair, as you called it, is, in fact, a factor, because he is still mobile with an edged weapon. And as he closes distance with an edged weapon, the edged weapon still remains the same.
>
> It is still a touch tool. It still only requires contact to inflict injury and the potential of lethal force.

(SOF 43) Mr. Patterson explained Officer Remington did what he was trained to do when faced with an edged weapon. The primary option is to move and draw so that an officer can engage with lethal force. Until an officer gets more resources, the officer might be able to change that approach but with an edged weapon, the primary option is to move and draw. The only less lethal that may work is a flex baton (bean bag round). (SOF 43) But here, Richards escalated the immediacy of the threat as he drove towards the Lowe's entrance with a cashier just as backup arrived. (SOF 44)

Steve Ijames testified Mr. Richards posed an immediate threat. This began with the armed robbery with the knife, the multiple minutes of the officer following him and the statements concerning "you'll have to kill me," his basic resistance, armed resistance the entire time, and the fact that as they reached the Lowes, Richards armed with a knife and moving in a direction towards an uninvolved citizen. (SOF 45)

**3. Termination and Civil Service Hearing**

Within 24 hours after this shooting there was an unfair rush to judgment by City Mayor Regina Romero and former Chief of Police Chris Magnus. Before any full

investigation was completed both took to the airwaves to condemn Officer Remington. He was fired and lost his job purportedly for the use of deadly force. At the Civil Service Hearing, however, the chain of command including the current Chief of Police agreed that Officer Remington's use of deadly force was objectively reasonable:

> Q. So you would agree you've been sitting in on this. I've taken very specific notes about that moment. And Cornia was the first one to say. "I believe the shooting at that moment, the decision, the snapshot of that moment, he was within policy to take that shot. You heard him say that?
>
> Chief Kasmar: He did say that. Yes.
>
> Q. And, uh, Hall agreed with that, right?
>
> Chief Kasmar: Yes.
>
> Q. You agree with that?
>
> Chief Kasmar: Yes.
>
> Q. The actual shooting, the actual decision, all right, from what I see, from what I'm perceiving at this moment, my decision is to employ deadly force. None of you three have a problem with that decision at that moment.
>
> Chief Kasmar: Correct.

(SOF 46) The purported reason for upholding the termination was based on TPD General Order that officers should carry all of their equipment, and Officer Remington should have had all of his equipment include taser, baton, and OC Spray. There is no standard of care that requires officers to even carry such equipment much less requiring the use of any of these tools under these circumstances.

**4. Pending Criminal Case - Second Grand Jury Returned a "No Bill."**

Initially, Officer Remington was indicted, but the indictment was set aside because of prosecutorial misconduct. A second grand jury was convened and returned a "no bill." Nonetheless, the prosecutor has dragged this case forward and has stated his intention to seek another indictment. Suspecting more prosecutorial misconduct, Officer Remington's defense attorney has sought the transcript from the second grand jury, and that issue is currently pending before the Arizona Supreme Court. Because the prosecutor is still threatening an indictment, at a deposition in this case, Officer Remington invoked his Fifth Amendment rights based on advice of counsel. During the investigation, Officer Remington was interviewed and also made a *Garrity* statement. This has been produced to Plaintiff and her experts.

**5. The Complaint**

On September 19, 2022, Plaintiff filed a Complaint that includes four counts. (1) Excessive Force in violation of the Fourth Amendment against Remington only; (2) American with Disabilities Act Claim against the City of Tucson; 3) Rehabilitation Act Claim against the City of Tucson; and 4) A.R.S. § 12-611, Wrongful Death Claim.

**6. Argument**

**A. Deadly Force was Reasonable as a Matter of Law**

**Count I: Fourth Amendment – Unreasonable Seizure (Excessive Force)**

Deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer or others."

*Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The Fourth Amendment objective-reasonableness standard applies. *Graham v. Connor*, 490 U.S. 386 (1989). Under this standard:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
>
> *****
>
> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> *****
>
> [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable' in light of the facts and circumstances confronting them…

*Id.* at 396-97 (citations omitted). When determining whether the totality of the circumstances justifies the degree of force, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

When Richards pulled out a knife on David Louie telling him this was his receipt and causing him to jump back, Richards committed aggravated assault and his theft now became armed robbery and misconduct involving weapons. (A.R.S. § 13-1204A.8(a); §13-1904; §13-901.03) He also committed endangerment. (A.R.S. § 13-1201(A)) Throughout the time from the initial encounter in the Walmart parking lot and as Richards continued towards Lowe's, Officer Remington attempted to get Richards to stop

and drop the knife. As he attempted to enter Lowe's still holding his knife, he was an immediate threat to the Lowe's clerk.

The fatal shooting meets the *Graham v. Connor* standard.

1) The severity of the crime: Mr. Richards committed aggravated assault on law enforcement officers and presented a deadly threat to law enforcement officers and the public.

2) Whether the suspect poses an immediate threat to the safety of the officers or others: Mr. Richards posed an immediate threat to the officers and others.  Multiple attempts were made to get him to stop and drop the knife. After reaching the garden entrance, he continued directly towards the cashier while holding the knife pointing up.

3) Whether he is actively resisting arrest or attempting to evade arrest by flight: Richards was actively attempting to evade felony arrest by refusing to stop, stating this was not going to end without a fight, and Officer Remington would have to kill him.

The Ninth Circuit recently held under similar facts that the use of deadly force did not violate the Fourth Amendment. For example, in *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. April 19, 2024), the officers responded to a call and confronted Hart in his backyard holding a knife. He had cut himself multiple times. He was told to "drop the knife" but he continued advancing towards officers and came within a few feet of the officers. A taser was fired but was ineffective and another officer fired five shots killing Hart. "The officers did not warn Hart that they would shoot, but with him approaching and wielding a knife, they took action to protect themselves." The court held the officer's actions were objectively reasonable under the Fourth Amendment. Hart posed an immediate threat to the officer, he was not responding to comply with the command to "drop the knife," and he approached the officers holding the knife towards them. The

officer's decision to fire was based on Hart's failure to comply with commands, his approach, and his possession of a lethal weapon. The Ninth Circuit rejected the district judge's ruling that Hart had committed no offense, was suicidal, was not a flight risk, did not pose a threat to others, and there was a dispute on whether an adequate warning that force would be used by the officers. The court rejected this because the evidence was Hart was holding a knife and was at most 37 feet away and approaching the officers. Hart failed to respond to repeated commands to drop the knife, and whether he ran or briskly walked towards the officers was immaterial given he crossed the yard in less than six seconds. The Ninth Circuit relied on several other cases including *Blanford v. Sacramento County*, 406 F.3d 1110, 1116 (9th Cir. 2005), *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014), *Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013), and *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc). The court rejected plaintiff's second-guessing including that Hart did not pose an immediate threat. Similarly, in *Ochoa v. City of Mesa*, 26 F.4th 1050 (9th Cir. 2022), the court held the shooting of a suspect on meth who had two knives and refused officers' commands to drop the knife was constitutionally reasonable. *See also Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002); *Forrett v. Richardson*, 112 F.3d 416 (9th Cir. 1997); *Reynolds v. County of San Diego*, 84 F.3d 1162 (9th Cir. 1996).

Indeed, summary judgment is proper where an officer reasonably perceived a deadly threat and used deadly force, even though the suspect was not armed. *Waid v. County of Lyon*, 87 F.4th 383, 386 (9th Cir. 2023) (officers shot unarmed man who ran at

them in a residential hallway); *Lemmon v. City of Akron, Ohio*, 768 Fed. Appx. 410, 412-14 (6th Cir. 2020), (officer ordered suspect to show his hands, suspect placed hand in his front waistband, made quick movement towards officer who shot four times, suspect was unarmed); *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 398-400 (6th Cir., 2015) (suspect reached toward the vehicle floorboard, suspect ordered to show his hands, suspect extended his arms and clasped his hands into a shooting posture, officers called out "Don't do it" and "Drop it," suspect again reached down into the floorboard before making the same shooting posture, suspect was unarmed, 80 shots fired, 23 bullets struck suspect, killing him.)

Plaintiff second-guesses and speculates that Officer Remington could have tried to use a taser, OC spray, or hand baton to stop Richards before backup arrived and he reached the Lowe's entrance. Plaintiff has suggested the gate could have been rolled closed or Officer Remington should have retreated. These are not real issues, and this is not an objective standard. The issue is whether the use of deadly force was reasonable. Officers have no duty to retreat and no obligation to use less intrusive alternatives. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1992) (the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them); *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (a reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable). As Paul Patterson explained, an officer should not holster his weapon to use some other option unless there is backup.

**B.    Plaintiff has abandoned Counts II and III against the City of Tucson:**

Plaintiff has abandoned the ADA and Rehabilitation Act Claims. There has been no discovery on these issues, no disclosure, no expert opinions, and Richards' disability claim or accommodation claim is quite beside the point.  "When police use deadly force against a person who has committed serious crimes and presents an immediate threat of serious injury or death to others, the presence of emotional disturbance does not reduce the governmental interest in using deadly force." *Elifritz v. Fender*, 400 F.Supp.3d 1088, 1111 (D. Or. 2020) (citing *City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015), *Lal v. California*, 746 F.3d 1112, 1117-1118 (9th Cir. 2014)); *Kitchen v. City of San Leandro*, 4:22-cv-02373 (N.D. Cal. Oct. 5, 2022).

**C. Count IV: A.R.S. 12-611, Wrongful Death Claim Fails Under State Law**

Arizona law provides a defense to battery when an officer's use of force is reasonable.  A.R.S. §§ 13-409 and 13-410 (C). These statutes justify the use of deadly force when reasonably necessary to effect an arrest or detention when the peace officer "reasonably believes that it is necessary. . .to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force." Additionally, under § 13-411 (A), Remington was justified in using deadly physical force against Richards if he reasonably believed it was immediately necessary to prevent his commission of aggravated assault under § 13-1204(A)(1) and (2). The statute also provides:

(B) There is no duty to retreat before threatening or using deadly physical force justified by subsection A of this section.

(C) A person is presumed to be acting reasonably for the purposes of this section if he is acting to prevent the commission of any of the offenses listed in subsection A of this section. [including aggravated assault with a "deadly weapon or dangerous instrument."]

Finally, an officer's use of force is an intentional act. There is no claim for negligence. *Ryan v. Napier*, 245 Ariz. 54, ¶21 (2018); *Weber v. City of Kingman*, 2022 Ariz.App.Unpub. LEXIS 398, 2022 WL 1468246 (Div. 1, May 10, 2022) (no negligence claim for pre-shooting tactical decisions). The state law wrongful death claim fails for the same reasons the as the Fourth Amendment excessive force claim. Additionally, Arizona also recognizes qualified immunity, both statutory and common law. *Spooner v. City of Phoenix*, 246 Ariz. 119 (2018) (officers are entitled to statutory immunity under A.R.S. § 12-820.05(A) and common law).

**7. Qualified Immunity Applies**

Officer Remington is entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

First, as discussed above, there was no constitutional violation. The fatal shooting was objectively reasonable as a matter of law. Second, a "right is clearly established when it is sufficiently clear that every reasonable official would have understood that

what he is doing violates that right." *Waid v. Cnty. of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) While a case need not be directly on point, existing precedent must "place the statutory or constitutional question beyond debate." *Id.* (cleaned up). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal citations omitted). "Cases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal citation omitted). "While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (cleaned up). "[T]his obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context because a categorical statement that conduct obviously violates the Fourth Amendment is particularly hard to make when officers encounter suspects every day in never-before-seen ways, including countless confrontations that yield endless permutations of outcomes and responses." *Id.* (cleaned up). As such, Fourth Amendment violations must be beyond debate to be considered obvious. *Id.* (citation omitted); *Villanueva v. California*, 986 F.3d 1158, 1171 (9th Cir. 2021) ("Because excessive use of force is a highly fact-specific inquiry, even when we determine excessive force was used, 'police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.'") (quoting *Kisela v. Hughes*, 584 U.S. 100, 138 S. Ct. 1148, 1153 (2018)). The Court must "view the facts as

1  an officer would have encountered them on the night in question, not as an ex post facto

2  critic dissecting every potential variance under a magnifying glass." *Monzon v. City of*

3  *Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020).

4  　　　In *Kisela v. Hughes*, 584 U.S. 100 (2018), the Supreme Court recognized qualified

5  immunity applied and reversed the Ninth Circuit. Andrew Kisela, a University of Arizona

6  police officer, shot Hughes after responding to a 911 call that a woman was engaging in

7  erratic behavior with a knife. When Kisela fired, Hughes was holding a large kitchen

8  knife, had taken steps toward another woman standing nearby, and had refused to drop

9  the knife after at least two commands to do so. The Supreme Court reversed the Ninth

10 Circuit's in a per curiam opinion. The Court held Kisela was entitled to qualified

11 immunity because his use of force did not "violate clearly established statutory or

12 constitutional rights of which a reasonable person would have known." The Court noted

13 that use of excessive force is an area of the law in which the result depends very much on

14 the facts of each case, and thus police officers are entitled to qualified immunity unless

15 existing precedent "squarely governs" the specific facts at issue. The Court found no such

16 existing precedent and rejected the Ninth Circuit's reliance on generally applicable

17 authorities to deny qualified immunity. *See also Ventura v. Rutledge*, 978 F. 3d (9th Cir.

18 2020) (officer entitled to qualified immunity for using deadly force when suspect

19 advanced towards him with a knife); *Waller v. City of Nogales*, 2024 WL 706976, 2024

20 U.S. Dist. LEXIS 29259 (D. Ariz. February 20, 2024) (use of deadly force (146 shots) in

21 stopping semi-truck driver reasonable because driver continued to present a threat to the

17

public); *Harris v. City of Phoenix*, No. CV-20-00078-PHX-DLR, 2022 WL 3682027, 2022 U.S. Dist. LEXIS 15372 at *5-6 (D. Ariz. Aug. 25, 2022) (officer justified in using deadly force when he knew the decedent committed a felony minutes prior and was actively fleeing at the time the officer used force); *Yearick v. County Maricopa*, No. CV-20-00545-PHX-SPL, 2022 WL 3721910, 2022 U.S. Dist. LEXIS 157568 at *37-38, 40-41 (D. Ariz. Aug. 19, 2022) (deadly force permissible under federal and Arizona law where the Decedent "was advancing directly toward the officers at the time they fired their weapons" and "was ignoring clear verbal warnings from Defendants as he moved closer and closer.")

**CONCLUSION**

For these reasons, Defendant Remington requests summary judgment. The Defendant also request attorneys' fees and costs on the state law claims under A.R.S. § 12-716 and §13-420.

DATED this 14th day of June, 2024.

HUMPHREY & PETERSEN, P.C.

*/s/ Andrew Petersen*
Andrew J. Petersen
Attorney for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2024, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

John H. Bradley
Strang Bradley, LLC
613 Williamson Street
Suite 204
Madison WI 53703
Attorney for Plaintiff
john@strangbradley.com

Andrew Sterling
Office of the Tucson City Attorney Civil Division
P.O. Box 27210
Tucson, AZ 85726-7210
Attorney for Defendant City of Tucson
andrew.sterling@tucsonaz.gov

*/s/ Cassandra Marie Chambers*

H:\MHFILES\8048-1\MSJ.docx