1  **WO**

2

3

4

5  **IN THE UNITED STATES DISTRICT COURT**

6  **FOR THE DISTRICT OF ARIZONA**

7

8  Victoria Richards,

9         Plaintiff,

10  v.

11  Ryan T Remington, et al.,

12         Defendants.

No. CV-22-00429-TUC-JGZ

**Order on
Motions for Summary Judgment**

13

14

15        Richard Richards was shot and killed by Defendant Ryan Remington, a Tucson

16  Police Department (TPD) Officer, on the evening of November 29, 2021, as Richards

17  drove his electric mobility scooter towards the entrance of a Lowe's Garden Center.

18  Plaintiff Victoria Richards, as special administrator of the Estate of Richard Richards,

19  brings this action for compensation against Remington and the City of Tucson. In Count I

20  of her Complaint, Plaintiff alleges Remington violated Richards's Fourth Amendment right

21  to be free from excessive force. In Count IV, Plaintiff asserts a state law wrongful death

22  claim against Remington. In Counts II and III, Plaintiff asserts the City of Tucson violated

23  the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) because

24  Remington failed to provide Richards with reasonable accommodations during his arrest.

25        Now pending before the Court are three motions for summary judgment. (Docs. 87,

26  89, 91.) Defendant Remington seeks summary judgment on all counts against him, arguing

27  as to Count I, he did not violate Richards's Fourth Amendment right to be free from

28  excessive force and is entitled to qualified immunity, and as to Count IV, he is protected

by state statutory immunity. (*See* Doc. 89.)

Plaintiff seeks partial summary judgment on Counts I and IV, arguing that Remington is not entitled to qualified or statutory immunity because, after firing eight shots at Richards, Remington paused before shooting Richards a ninth time. (Doc. 91.) Plaintiff contends that the final shot was unreasonable as a matter of law. (*Id.*)

Defendant City of Tucson seeks summary judgment on Plaintiff's ADA and RA claims—Counts II and III. (*See* Doc. 87.) The City argues Plaintiff has failed to provide evidence essential to these claims.

Remington and Plaintiff's motions are fully briefed at Docs. 89, 91, 101, 106, 116, 119. The City's motion is fully briefed at Docs. 87, 104, and 115. Argument on the motions was heard on December 16, 2024.

## I.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (internal quotation marks omitted). A fact is "material" when its resolution "might affect the outcome of the suit under the governing law." *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact. *Celotex Corp.*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, "the burden shifts to the non-moving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record includes a video, a court should view the facts in the light depicted by the videotape." *J.A.L. by & through Valdez v. Santos*, 724 F. App'x 531, 532-33 (9th Cir. 2018) (quotation marks and citation omitted). However, "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried.

## II.    Factual Background[1]

### A. Factual Challenges

The interactions between Richards and Remington occurred in three locations. Remington initially confronted Richards in a Walmart Superstore parking lot. Richards then drove his scooter, with Remington following, through the large parking lot, traveling away from Walmart, and past GameStop and dd's Discount clothing store; crossing a road; traveling down a corridor beside the Lowe's and into the parking lot in front of the Lowe's

---

[1] Remington's Statement of Facts is cited as (Doc. 90, DSOF) and Plaintiff's Controverting Statement of Facts is cited as (Doc. 107, PCSOF). With respect to Plaintiff's Motion for Summary Judgment against Remington, Plaintiff's Statement of Facts is cited as (Doc. 92, PSOF) and Remington's Controverting Statement of Facts is cited as (Doc. 102, DCSOF). The video surveillance footage is cited as (Doc. 90, Def.'s Ex. A or Ex. C) and (Doc. 92, Pl.'s Ex. D, J, or L). Defendant's Exhibit A consists of three electronic video files labeled COT2508, COT2517, and COT 2518. In its citation, the Court refers to the files by these same labels. The video labeled "COT2508" is a view of the entrance of the Walmart store. The videos labeled "COT2517" and "COT2518" show different perspectives of the Walmart parking lot. Ex. C is a view of the Lowe's garden shop entrance. Officer Stephanie Wade's body camera footage is cited as (Doc. 90, Def.'s Ex. B; Doc. 92, Pl.'s Ex. C). Officer German Gastelum's body camera footage is cited as (Doc. 92, Pl.'s Ex. K).

The City of Tucson failed to file a statement of facts compliant with LRCiv. 56.1, (*see* Doc. 88), and at oral argument, stated it did not dispute the facts contained in the Plaintiff's Controverting Statement of Facts. This second controverting statement of facts by Plaintiff is cited as (Doc. 105, PCSOF).

store. Finally, Richards turned into the parking lot in front of Lowe's and Remington shot Richards when he turned towards the entrance to the Lowe's garden center.

Video captured significant parts of their interactions in the first and last parking lots, and witnesses were present at these two locations. In contrast, Remington and Richards were the only witnesses to what transpired during their travel out of the Walmart parking lot to the Lowe's parking lot. The only recordings pertaining to this intermediate period are radio dispatches.

In support of his motion for summary judgment, Remington relies on statements he made during an interview with the Office of Personnel Standards (OPS) after the shooting. (*See* Doc. 90, DSOF ¶¶ 15–19; Doc. 90-1, Def.'s Ex. W, at 571–604.)[2] In the interview, he relates what he and Richards said while walking through the Walmart parking lot to the Lowe's. (*Id.*) The Court will grant Plaintiff's request that the Court not consider Remington's statements. Plaintiff argues that Remington prevented discovery into material facts of the case at his deposition by invoking his Fifth Amendment right against self-incrimination in response to every question asked other than what his name was, and that Remington's invocation prevented Plaintiff from examining the veracity of Remington's assertions and challenging his credibility. (Doc. 106 at 3.)

The Court agrees that Remington should not be permitted to offer his prior statements on an issue on which he refused to answer questions. *See United States v. Rylander*, 460 U.S. 752, 758 (1983) (holding a respondent in a civil contempt hearing could not use his Fifth Amendment assertion to "convert the privilege from the shield against compulsory self-incrimination…into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his."). By invoking his Fifth Amendment right at deposition, Remington prevented the evaluation of the truthfulness of his interview statements. For that reason, the Court does not consider Remington's statements listed in Exhibit K, the "List of What Was Said,"

---

[2] Remington submitted a declaration attesting to the truth of the statements that he made during the interview and attached a transcript of the interview. (Doc. 90-1, Def.'s Ex. W, at 571–604.)

(Doc. 90-1, Def.'s Ex. K, at 501), or Remington's experts—to the extent the experts relied on Remington's interview statements in forming their opinions, (Doc. 90, DSOF ¶¶ 41–45).

The Court will deny Plaintiff's request to sanction Remington's invocation of his Fifth Amendment rights and draw an adverse inference against him on the question of whether Richards posed an imminent threat at the time of the shooting because independent evidence exists as to this issue, from surveillance and body cameras and the testimony of third-party witnesses, and because to do so would be unduly prejudicial to Remington, who had the right to invoke the privilege against self-incrimination. *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911–12 (9th Cir. 2008) (concluding the adverse inference should not be drawn "unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000))); *see also Glanzer*, 233 F.3d at 1266 (the value of the adverse inference must substantially outweigh the danger of unfair prejudice to the party asserting the privilege). The video evidence and third-party witness testimony provide important evidence, including evidence of the actual shooting, from which the use of force can be evaluated.

The Court does not consider Remington's Exhibit L - Richards's "Prison Record Chronology." (*See* Doc. 90-1 at 506.) There is no evidence that Remington was aware of Richards's criminal history at the time of their encounter. Consequently, that information cannot be relevant in evaluating whether a reasonable officer in Remington's position would have concluded that Richards posed an immediate threat to anyone else. The reasonable officer analysis must be done using only the facts known to Remington at the time. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).

B. Undisputed Facts

The remaining facts are largely undisputed, although the parties dispute the inferences to be drawn from those facts. Excluding Remington's declaration and unsworn testimony, the relevant facts are as follows, and are undisputed, except as noted.

*1.  The Initial Encounter with Richards at Walmart*

On the evening of November 29, 2021, at approximately 6:00 p.m., Walmart employee David Louie observed Richards leaving the store in his electric mobility scooter and setting off the store merchandise alarm. (Doc. 90, DSOF ¶ 1; Doc. 107, PCSOF ¶ 1.) Louie saw unpaid merchandise, a toolbox, in Richards's electric mobility scooter and asked to see his receipt. (Doc. 90, DSOF ¶ 2; Doc. 107, PCSOF ¶ 2; Doc. 92, PSOF ¶ 7–8.) Richards ignored Louie and continued into the parking lot. (Doc. 90, DSOF ¶ 3; Doc. 107, PSOF ¶ 8.) Louie went to the Walmart security office and told TPD Officer Remington what was going on. (Doc. 90, DSOF ¶ 4; Doc. 107, PCSOF ¶4; Doc. 92, PSOF ¶ 9.)

Remington was working a "special duty" assignment as an off-duty security officer at Walmart. (DSOF ¶ 5; Doc. 107, PCSOF ¶ 5; Doc. 92, PSOF ¶¶ 10, 13.) Remington was wearing his TPD uniform and carrying his service weapon and taser. (Doc. 92, PSOF ¶¶ 13, 15; Doc. 102, DCSOF ¶¶ 13, 15.) Remington was not carrying oleoresin capsicum (OC) spray, commonly referred to as "pepper spray," or a baton, as required by TPD policy. (Doc. 92, PSOF ¶¶ 14–15; Doc. 102, DCSOF ¶¶ 14–15.)

Remington followed Louie into the Walmart parking lot to confront Richards. (Doc. 90, DSOF ¶ 6; Doc. 107, ¶ 6; Doc. 92, PSOF ¶ 16; Doc. 102, DCSOF ¶ 16.) Surveillance video shows Richards traveling through multiple traffic lanes in the Walmart parking lot, maneuvering his scooter around traffic and between parked vehicles. (Doc. 90, Def.'s Ex. A (COT2517) at 02:46–02:54, (COT2518) at 02:39–02:33; Doc. 92, Pl.'s Ex. J at 00:02–00:49.) Remington and Louie caught up to Richards near the back of the parking lot. (Doc. 92, Pl.'s Ex. J at 01:09.) Louie again asked Richards for a receipt. (Doc. 90, DSOF ¶ 7; Doc. 107, PCSOF ¶ 7; Doc. 92, PSOF ¶ 17; Doc. 102, DCSOF ¶ 17.) Richards responded by pulling out a knife saying, "Here is my receipt." (Doc. 90, DSOF ¶ 7; Doc. 107, PCSOF ¶ 7.) Richards pointed the knife[3] at Louie causing Louie to fear for his life and safety. (Doc.

---

[3]     Plaintiff asserts a jury could find Richards did not point the knife at Louie based on Louie's contradictory statement at his deposition, where he testified that "Richards did not lift his arm off the armrest of the wheelchair and did not point the knife at him," and in Louie's interview with police, where he said the knife was pointed up and he was worried

90, DSOF ¶ 8; Doc. 107, PCSOF ¶ 8; Doc. 92, PSOF ¶ 18; Doc. 102, DCSOF ¶ 18.) Louie did not know whether Richards was truly disabled or whether he could have jumped out of the scooter and stabbed him. (Doc. 90, DSOF ¶ 9; Doc. 107, PCSOF ¶ 9.)

Remington drew his service pistol and pointed it at Richards. (Doc. 92, PSOF ¶ 19; Doc. 102, DCSOF ¶ 19.) The surveillance video shows Richards's head and torso illuminated with the weapon's attached flashlight. (Doc. 92, Pl.'s Ex. J at 01:09.) Louie believes that Remington's intervention stopped Richards from stabbing him. (Doc. 90, DSOF ¶ 10; Doc. 107, PCSOF ¶ 10.) As Louie retreated, he heard Richards say to Remington that Richards would drop the knife only if Remington shot him. (Doc. 92, PSOF ¶ 20; Doc. 102, DCSOF ¶ 20.)

### 2.  *Travel to Lowe's*

Richards drove the scooter away from Remington, through the parking lot, heading towards an exit on the west side of the lot. (Doc. 90, DSOF ¶ 11; Doc. 107, PCSOF ¶ 11.) Remington followed with his gun drawn, directing other customers in the parking lot to move away. (Doc. 90, DSOF ¶ 12; Doc. 107, PCSOF ¶ 12; Doc. 92, PSOF ¶ 21; Doc. 102, DCSOF ¶ 21.)  Remington called for back-up within seconds of his first radio transmission. (Doc. 90, DSOF ¶ 13; Doc. 107, PCSOF ¶ 13.)

Remington was able to keep pace with Richards's electric scooter the entire time that he followed him. (Doc. 92, PSOF ¶ 22; Doc. 102, DCSOF ¶ 22; Doc. 92, Pl.'s Ex. L (video).) While still in the Walmart parking lot, Remington at times walked parallel to Richards and within reach of Richards. (Doc. 92, PSOF ¶ 23; Doc. 102, DCSOF ¶ 23; Doc. 92, Pl.'s Ex. L (video).) Before leaving the Walmart parking lot, Richards dropped the stolen toolbox. (Doc. 92, PSOF ¶ 24; DCSOF ¶ 24.)

Remington followed Richards across several parking lots, across a street, and into

---

that Richards was going to point the knife "towards [him] at some point" or was "eventually [going to] point it towards" him. (Doc. 107, PSCOF ¶ 8.) Undermining this argument, Plaintiff writes in her own Statement of Facts, that "Richards pointed the knife at Loui[e]" and Richards "brandished" the knife. (Doc. 92, PSOF ¶¶ 17, 18.) Regardless of whether the tip of the knife was directly pointed at Louie, it is undisputed that Richards's presentation of the knife caused Louie to fear for his life and safety. (Doc. 90, DSOF ¶ 8; Doc. 107, PCSOF ¶ 8; Doc. 92, PSOF ¶ 18; Doc. 102, DCSOF ¶ 18.)

the parking lot of the adjacent Lowe's Home Improvement. (Doc. 92, PSOF ¶ 25 & Ex. K; Doc. 102, DCSOF ¶ 25; Doc. 90, DSOF ¶¶ 14–16; Doc. 107, PSOF ¶ 25.) For approximately five minutes,[4] Remington followed Richards as Richards "tried to get away." (Doc. 92, PSOF ¶ 26; Doc. 102, DCSOF ¶ 26.)  During this time, Remington communicated, by radio, several updates to dispatch, relaying that Richards had shoplifted, pulled a knife on Remington, and their location. (Doc. 92, PSOR ¶¶ 27–28; Doc. 102, DCSOF ¶¶ 27–28.) An officer responded that they would be sending a "flex." (Doc. 92, PSOF ¶ 29; Doc. 102, DCSOF ¶ 29.)  "A 'flex,' also called a 'less lethal,' is a shotgun that shoots socks filled with shotgun shot. The purpose of a flex is to deliver blunt force trauma without penetration of the target." (Doc. 92, PSOF ¶ 30; Doc. 102, DCSOF ¶ 30.) Remington did not mention to dispatch or other officers that Richards was riding an electric mobility scooter. (Doc. 92, PSOF ¶ 32; Doc. 102, DCSOF ¶ 32.)[5]

### 3.  Shooting at Lowe's Garden Center

Once in the Lowe's parking lot, Richards turned his wheelchair toward the Garden Center entrance of Lowe's. (Doc. 92, PSOF ¶ 36; Doc. 102, DCSOF ¶ 36.)  The Parties dispute whether Richards's turn into the entrance was "abrupt." (Doc. 90, DSOF ¶ 20; Doc. 107, PCSOF ¶ 20.)  There was only one person near the entrance - Lowe's employee Sara Kardel. (Doc. 92, PSOF ¶ 37; Doc. 102, DCSOF ¶ 37.)  As Richards and Remington approached the Lowe's store, and from their perspective, Sara Kardel could be seen seated on a stool to right of and just inside the entrance. (Doc. 92, PSOF ¶ 40 & Ex. D at 00:00; Doc. 102, DCSOF ¶ 40 & Ex. C at 00:00.) Kardel was facing into the store at an angle, with her back to the exterior wall and her left shoulder turned towards the entrance. (*Id*.) Kardel's head was turned to her left, and she was looking into the parking lot as Richards and Remington approached the garden center. (*Id*. at 00:02–00:06.)

TPD Officer Stephanie Wade (formerly known as Stephanie Taylor) arrived in the

---

[4]   Defendant contends that the travel time was closer to four minutes, while Plaintiff asserts it was at least five minutes. (Doc. 92, PSOF ¶ 26; Doc. 102, DCSOF ¶ 26.)

[5]   For the reasons stated in Section II.A, the Court does not consider Remington's unrecorded statements regarding his conversation with Richards during this time period (*See* Doc. 90, DSOF ¶¶ 17–19; Doc. 107, PCSOF ¶¶ 17–19.)

Lowe's parking lot near the entrance to the Garden Center, exited her squad car, and started running towards Richards just as Richards turned north to go into the store entrance. (Doc. 90, DSOF ¶ 21 & Ex. B at 00:05; Doc. 107, PCSOF ¶ 21; Doc. 92, PSOF ¶38 & Ex. C at 4:02; Doc. 102, DCSOF ¶ 38.)  Officer Wade ran toward Remington and Richards with her gun drawn. (Doc. 90, DSOF, Ex. B at 00:05–00:09; Doc. 92, PSOF Ex. C at 04:02–04:06.) As Wade was approaching, Remington told her that Richards had a knife in his hand. (Doc. 92, PSOF ¶ 41; Doc. 102, DCSOF ¶ 41.) Remington also said to Richards, "You're not going into the store, sir." (Doc. 92, PSOF ¶ 42; Doc. 102, DCSOF ¶ 42.) Kardel stood up as Richards, Remington, and Wade approached. (Doc. 92, PSOF ¶ 43 & Ex. D at 00:09; Doc. 102, DCSOF ¶ 43; Doc. 90, DSOF Ex. C at 00:09.)  Officer Wade yelled, "Stop now! You need to stop!" (Doc. 92, PSOF ¶ 45 & Ex. C at 04:12; Doc. 102, DCOSF ¶ 45; Doc. 90, DSOF Ex. B at 00:15.) Richards did not stop. (DSOF 90, ¶23; Doc. 107, PCSOF ¶ 23.) Richards was holding the knife pointed up. (*Id.*) The parties dispute whether he was driving towards the cashier or at an angle to drive past her. (*Id.*)

As Officer Wade began to give Richards another command, Remington, who was walking behind and to the left of Richards, moved slightly to the side of Richards and fired eight shots into Richards's back and side. (Doc. 92, PSOF ¶ 46, Ex. C at 04:14–04:16 & Ex. D at 00:10; Doc. 102, DCSOF ¶ 46; Doc. 90, DSOF Ex. B at 00:17–00:19 & Ex. C at 00:10.) At the time Remington fired, Remington was approximately five to eight feet away from Richards. (Doc. 90, DSOF ¶ 25; Doc. 107, PCSOF ¶ 25.) Richards was approximately 19 feet away from Kardel. (Doc. 92, PSOF ¶ 47; Doc. 102, DCSOF ¶ 47.)  Remington did not warn Richards that he was going to use lethal force before he shot him. (Doc. 92, PSOF ¶ 44; Doc. 102, DCSOF ¶ 44.)

Richards slumped forward in his scooter. (Doc. 92, PSOF at 48.) Remington paused for just over one second and fired a ninth shot at Richards. (Doc. 92, PSOF ¶ 51 & Ex. C at 04:16-4:17; Doc. 102, DCSOF ¶ 51; Doc. 90, DSOF Ex. B at 00:19-00:20.) Before the ninth shot, the cashier ran into the Garden Center. (Doc. 90, DSOF Ex. C at 00:10–00:12; Doc. 92, PSOF Ex. D at 00:10–00:12.) Video from Officer Wade's body-camera and the

store show that Richards dropped the knife before the ninth shot was fired. (Doc. 107, PCSOF ¶ 61; Doc. 90, Def.'s Ex. C at 00:13; Doc. 92, Pl.'s Ex. D at 00:13).

Richards fell head-first out of his scooter and Remington handcuffed him. (Doc. 92, PSOF ¶¶ 52-53; Doc. 102, DCSOF ¶¶ 52-53.) Richards was alive after being shot; he was still breathing and moving his right foot. (Doc. 92, PSOF ¶ 54; Doc. 102, DCSOF ¶ 54.) Officer Gastelum arrived at the scene about 30 seconds after Remington shot Richards. (Doc. 92, PSOF ¶ 55; Doc. 102, DCSOF ¶ 55.) Richards died from injuries sustained in the shooting. (Doc. 92, PSOF ¶ 57; Doc. 102, DCSOF ¶ 57.)

### III.    Fourth Amendment Excessive Force – Count I

Plaintiff's first claim is brought against Remington under 42 U.S.C. § 1983 for use of excessive force in violation of the Fourth Amendment. (*See* Doc. 1 at ¶¶ 75–81.) The Fourth Amendment protects all persons from the use of excessive force during an arrest, detention, or other seizure. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Remington moves for summary judgment based on qualified immunity. (Doc. 89 at 15–18.) He argues that he is entitled to qualified immunity under both prongs of the analysis: (1) because no violation of the Fourth Amendment occurred as his use of deadly force was objectively reasonable pursuant to the test laid out in *Graham*; and (2) even if there was violation of Richards's Fourth Amendment right, because that right was not "clearly established" at the time of the shooting. (Doc. 89 at 9–13, 15–18.) Plaintiff responds that: (1) Remington's use of deadly force was objectively unreasonable and therefore a violation of the Fourth Amendment because Richards was not an immediate threat to any one; and (2) Remington is not entitled to qualified immunity because Richards's Fourth Amendment right—"that a police officer cannot use lethal force on a person who does not present an imminent threat of death or serious bodily harm to another person"—was clearly established at the time of the shooting. (Doc. 106 at 1–3.)

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct

1   does not violate clearly established statutory or constitutional rights of which a reasonable

2   person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified

3   immunity balances two important interests—the need to hold public officials accountable

4   when they exercise power irresponsibly and the need to shield officials from harassment,

5   distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*,

6   555 U.S. 223 (2009). In short, "[q]ualified immunity gives government officials breathing

7   room to make reasonable but mistaken judgments," and "protects all but the plainly

8   incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731,

9   743 (2011) (internal quotations omitted).

10          A.      Qualified Immunity

11          The qualified immunity inquiry is two-pronged and asks first whether the

12   defendant's conduct violated a constitutional right, and second whether that right was

13   clearly established at the time of the violation. *See Pearson*, 555 U.S. at 230–232, 235–236

14   (holding that courts may exercise their discretion in deciding which prong to address first).

15          At both prongs of the qualified immunity analysis, courts must draw all inferences

16   in favor of the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). ("Our qualified-

17   immunity cases illustrate the importance of drawing inferences in favor of the

18   nonmovant."). "Where a police officer has used deadly force, it is especially important that

19   we adhere to that approach . . . [b]ecause the person most likely to rebut the officers'

20   version of events—the one killed—cannot testify." *Calonge v. City of San Jose*, 104 F.4th

21   39, 44 (9th Cir. 2024) (cleaned up). The opposing party's evidence is to be believed and

22   all justifiable inferences that may be drawn from the facts placed before the court must be

23   drawn in favor of the opposing party. *See Anderson*, 477 U.S. at 255. "A 'justifiable

24   inference' is not necessarily the most likely inference or the most persuasive inference.

25   Rather, 'an inference as to another material fact may be drawn in favor of the nonmoving

26   party…if it is 'rational' or 'reasonable.'" *United Steelworkers of Am. v. Phelps Dodge

27   Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989). But "[i]nferences are not drawn out of thin air,

28   and it is the opposing party's obligation to produce factual predicate from which the

inference may be drawn." *See Perez v. City of Fresno*, 591 F. Supp. 3d 725 (E.D. Cal. 2022), *aff'd*, 98 F.4th 919 (9th Cir. 2024). Qualified immunity extends to police officers sued under § 1983. *O'Doan v. Sanford*, 991 F.3d 1027, 1035–36 (9th Cir. 2021). But it does not automatically apply in every circumstance; courts must first determine whether qualified immunity is categorically available to the defendant. *Jensen v. Lane Cnty.*, 222 F.3d 570, 576 (9th Cir. 2000). For example, qualified immunity does not "overlap with state action under [Section] 1983 when a government officer uses the 'badge of their authority' in service of a private non-governmental goal." *Bracken v. Okura*, 869 F.3d 771, 776 (9th Cir. 2017) (quotations omitted). Accordingly, the Court begins by considering whether qualified immunity is categorically available to Remington and then turns to whether his conduct, as alleged by Plaintiff, violated a clearly established constitutional right.

### 1.    Availability of qualified immunity

Plaintiff argues that qualified immunity is categorically unavailable because Remington was working an off-duty security assignment at Walmart when he first encountered Richards. (Doc. 106 at 2, 14.) Qualified immunity is categorically available to an off-duty officer only where (1) "history reveals a 'firmly rooted' tradition of immunity" and (2) extending immunity would serve the purposes underlying the immunity doctrine.[6] *Bracken*, 869 F.3d at 777. Applying this framework, the Court concludes qualified immunity is available to Remington.

Historical practice supports the availability of immunity in these circumstances. The Supreme Court has recognized a long-established tradition of extending immunity to "public servants and private individuals engaged in public service" when "carrying out government responsibilities." *Filarsky v. Delia*, 566 U.S. 377, 387–91 (2012). Although Remington began his shift as a private security guard, the undisputed record shows that, by

---

[6]    Qualified immunity "protect[s] government's ability to perform its traditional functions" by providing immunity where "necessary to preserve" the ability of government officials "to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Richardson v. McKnight*, 521 U.S. 399, 408 (1997) (citing *Wyatt v. Cole*, 504 U.S. 158, 167 (1992)).

the time of the shooting, he had transitioned into his public role as a police officer. After observing Richards holding a knife, Remington left the Walmart premises, contacted police dispatch, and followed Richards while awaiting additional officers. These actions were undertaken as part of a public-safety response and not to advance Walmart's private interests. Plaintiff identifies no historical basis for denying immunity to off-duty officers who assume traditional law-enforcement duties in response to an immediate public concern.

The purposes underlying qualified immunity also support its availability. At the time of the shooting, Remington was "carrying out the work of government"—monitoring an armed individual, communicating with dispatch, and responding to a potential threat to public safety. *See id.* at 389–90. Qualified immunity is intended to prevent undue hesitation in these circumstances, ensuring that officers can perform public duties without fear of personal liability when acting within the scope of their governmental role. Denying immunity solely because Remington's shift began as private security would undermine the doctrine's core purpose.[7]

Plaintiff relies on *Bracken* to argue that qualified immunity is categorically unavailable to police officers working off-duty security shifts. (Doc. 106 at 14). But *Bracken* does not preclude the availability of qualified immunity. There, the Ninth Circuit determined that immunity was unavailable where an officer acted solely on behalf of a private employer during a private-security assignment, and not "in the performance of public duties" or to "carry out the work of the government." 869 F.3d at 778 (quoting *Filarsky*, 566 U.S. at 389–90). The court expressly distinguished situations in which an off-duty officer "steps back into a police officer role," acknowledging that such

---

[7]   "Because government employees will often be protected by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Filarsky*, 566 U.S. at 391. Here, if one of the other responding officers, and not Remington, had shot Richards, qualified immunity would unquestionably be available in their defense. That Remington began the evening in an off-duty assignment does not strip him of protection once he re-entered his public role to address a threat to public safety. *Id.* ("Under such circumstances any [off-duty officer] with a choice might think twice before accepting a government assignment").

circumstances would present a "different case." *Id.* at 778 n.6. The facts here fall within that distinct category: Remington was engaged in a public-safety response and performing traditional law-enforcement duties at the time of the shooting.

For these reasons, the Court concludes that Remington is not categorically barred from asserting qualified immunity. The Court therefore proceeds to the qualified immunity analysis, which asks: "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019).

B.    Violation of the Fourth Amendment

Remington argues that his use of deadly force was reasonable as a matter of law because Richards had committed aggravated assault on a law enforcement officer, posed an immediate threat to the safety of the officer or others, and was actively resisting arrest or attempting to evade arrest. (Doc. 89 at 9–11.) Plaintiff argues that at the time of the shooting, Richards did not pose an imminent threat to anyone, and therefore Remington's use of deadly force was unreasonable as a matter of law. (Doc. 106 at 8–9.) Viewing the facts in the light most favorable to Richards on Remington's motion and viewing the facts in the light most favorable to Remington on Richards's motion, the Court concludes this question cannot be answered as a matter of law and must be decided by a jury.

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham*, 490 U.S. at 395–96. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97. Determining whether an officer used excessive force requires "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.* at 396.

### 1.    Nature and Quality of Intrusion

"The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the 'type and amount of force inflicted.'" *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)). Here, Remington used deadly force, shooting Richards eight times in his back and side. (Doc. 91 at 5.) The nature and quality of the intrusion on Richard's Fourth Amendment interests was therefore severe. *See Santos v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002), *overruled on other grounds by Pearson*, 555 U.S. 223 (holding that force was severe where a plaintiff suffered injury that caused "pain" or "immobility," or that "endured for a significant period of time"); *see also Garner*, 471 U.S. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched."). As the Ninth Circuit has recognized, "[t]he use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). The Court next determines whether the governmental interests at stake justified Remington's use of deadly force.

### 2.    Governmental Interests

The Court evaluates the government's interest using the *Graham* factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. However, these factors are not

1    exclusive; the Court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630

2    F.3d 805, 826 (9th Cir. 2010).

### a.    Severity of the Crime

4        First, the severity of the crime factor does not weigh determinatively in either

5    party's favor. Courts have emphasized that the severity of the crime diminishes when the

6    alleged criminal activity is no longer ongoing at the moment force is used. *See S.R. Nehad*,

7    929 F.3d at 1136 ("Even if Nehad had ... committed a serious crime prior to [the officer's]

8    arrival, he was indisputably not engaged in any such conduct when [the officer] arrived, let

9    alone when [the officer] fired his weapon.").

10       Here, Richards had committed two crimes. He initially had stolen a toolbox from

11   Walmart, a non-violent property offense. (Doc. 90-1 at 85–86.) But when confronted by

12   Walmart employee David Louie in the parking lot, Richards displayed a knife and raised

13   it towards Louie, causing Louie to fear for his life, resulting in a more serious offense.

14   (Doc. 91 at 3.) However, Richards discarded the toolbox and Louie and Richards both left

15   the Walmart parking lot. (*Id.*) By the time of the confrontation outside the Lowe's Garden

16   Center, the offenses were completed. Richards was not taking property or assaulting

17   anyone.  Although Richards's earlier threat to Louie is relevant to the overall governmental

18   interest, the Ninth Circuit has cautioned that the government's interest is reduced when the

19   underlying crime has ended and the suspect is no longer engaged in threatening conduct.

20   *See Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1050 (9th Cir. 2014)

21   (acknowledging that the crime at issue was "arguably severe," but still requiring analysis

22   of whether the crime was ongoing); *see also S.R. Nehad*, 929 F.3d at 1136.

23       A reasonable jury could infer that Richards's earlier brandishing of the knife weighs

24   in favor of Remington, suggesting a continuing risk of danger. However, a reasonable jury

25   could also conclude that no crime was in progress at the moment of the shooting, supporting

26   Plaintiff's view that the governmental interest was diminished. Although Richards was

27   carrying the knife in his hand, a jury could reasonably infer that Richards did not intend to

28   assault or harm anyone inside the Lowe's. He did not state such an intent, did not threaten

anyone, and was not focused on a particular person, unlike the situation in the Walmart parking lot where Richards had been confronted about the tool box by Louie. There was no reason for anyone at Lowe's to challenge Richards. Moreover, Remington had walked with Richards for 4 to 5 minutes without any apparent problem. Because the Court must draw all justifiable inferences in the non-movant's favor at summary judgment, *Tolan*, 572 U.S. at 657, the Court cannot conclude as a matter of law that the severity of Richards's crime justified Remington's use of deadly force.

### b. Resisting Arrest

The resisting arrest factor also does not weigh determinatively in either party's favor. "[T]he crux of [the second] *Graham* factor is compliance with the officers' requests, or refusal to comply." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011). Courts "draw a distinction between a failure to facilitate an arrest and active resistance to arrest." *Id.* Remington argues that he had sufficient grounds to believe that Richards was committing misdemeanor and felony offenses when Richards failed to comply with his orders and began moving away despite orders to stop. (Doc. 89 at 10–11.) It is undisputed that Richards drove his scooter away from Remington despite commands to stop. (*See* Doc. 90, Def.'s Exs. A, B, C; Doc. 92, Pl.'s Exs. C, D, J, K, L.) However, simply continuing to drive his scooter at a steady pace does not necessarily amount to fleeing or actively resisting arrest. *See A.K.H. ex rel. Landeros*, 837 F.3d at 1012 (holding that a person is not "flee[ing]" when he "continue[s] to move at about the same speed," even when an officer orders him to "get down").

From the undisputed facts, two competing inferences may be drawn. On the one hand, a jury could infer—as Defendants argue—that Richards was attempting to evade felony arrest by refusing to comply with lawful commands. (Doc. 89 at 11.) On the other hand, drawing inferences in Plaintiff's favor as required, a jury could reasonably conclude that Richards was merely noncompliant rather than actively resisting or attempting to flee, given that: (1) Richards was driving at a steady pace on a mobility scooter, not making sudden or evasive maneuvers; (2) Remington was often within a few feet of Richards, at

times close enough to reach him; and (3) Richards did not accelerate, abandon the scooter, or otherwise act in a manner consistent with an intent to escape. (Doc. 92, Pl.'s Ex. L.)

Because both inferences are rational, this factor does not decisively favor either side, and a jury could reasonably adopt either interpretation. *See United Steelworkers of America*, 865 F.2d at 1542 ("A 'justifiable inference' is not necessarily the most likely inference ... Rather, 'an inference as to another material fact may be drawn in favor of the nonmoving party ... if it is 'rational' or 'reasonable.'"). At the summary judgment stage, Plaintiff's inference must control. *Tolan*, 572 U.S. at 657. Accordingly, the Court cannot conclude as a matter of law that Richards was fleeing arrest.

### c.    Immediate Threat

Of the three *Graham* factors, the "most important" is "whether the suspect posed an immediate threat to the safety of the officers or others." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014). "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. To determine "whether there was an immediate threat, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Mattos*, 661 F.3d at 441-42 (internal citation omitted). In the deadly force context, courts cannot "simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Instead, "[t]he judge must carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts," including "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott*, 39 F.3d at 915).

Here, it is undisputed that Richards continued holding the knife as he approached the Lowe's Garden Center entrance. (Doc. 97, Def.'s Ex. C.) It is also undisputed that earlier, in the Walmart parking lot, Richards brandished that knife at David Louie, who

testified he feared for his life. (Doc. 92-4, Def.'s Ex. G at 5.) At the Lowe's Garden Center, cashier Kardel stood by the entrance as Richards approached the entrance. (Doc. 97, Def.'s Ex. C.)

The dispute concerns the inferences to be drawn from those facts. Remington argues that Richards was moving directly toward Kardel while still armed and refusing to drop the knife, such that a reasonable officer could conclude he had the ability, opportunity, and intent to cause serious harm. Plaintiff, however, emphasizes that Richards "did not raise the knife, he did not point the knife at anyone, and he did not say he was going to hurt anyone." (Doc. 106 at 10.) Plaintiff also notes that Richards remained seated in his mobility scooter, "was not moving at a brisk pace," and "was a full 19 feet away from Kardel when Remington shot him." (Doc. 106 at 13.) According to Plaintiff, Richards was "on a path to ride past [the] Lowe's cashier," rather than toward her. (Doc. 106 at 13.)

The physical and video evidence is susceptible to both interpretations. The video footage shows Richards holding the knife at his side but does not clearly depict whether his trajectory was toward Kardel or past her. (Doc. 97, Def.'s Ex. C.) The scooter was capable of traveling up to five miles per hour, or about 7.3 feet per second, meaning Richards could have closed the nineteen-foot distance in under three seconds. (Doc. 90-1 at 480.) Plaintiff, however, stresses that Richards's actual speed in the video appears slower and that he made no abrupt movements suggesting an imminent lunge.

The Ninth Circuit has made clear that officers are not required to "delay their fire until a suspect turns his weapon on them" when the suspect is armed and moving in a manner consistent with a threat. *George*, 736 F.3d at 838. At the same time, "the question on summary judgment … is not whether some version of the facts supports [the movant's] position, but rather whether a trier of fact, viewing the evidence in the light most favorable to [the non-movant], could find in [the non-movant's] favor." *S.R. Nehad*, 929 F.3d at 1133. Unless Plaintiff's account is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court must assume that a jury could find her version credible. *Orn v. City of Tacoma*, 949 F.3d 1167, 1171 (9th Cir. 2020) (quoting *Scott v. Harris*, 550

U.S. 372, 380 (2007)).

Here, the video and physical evidence do not "blatantly contradict" Plaintiff's contention that Richards did not pose an immediate threat. From the same facts, a jury could rationally infer either that Richards was advancing with the ability to reach Kardel quickly while armed, or that he was passing by without posing a threat. Because both inferences are reasonable, this factor cannot be resolved as a matter of law. Accordingly, it is for the jury—not the Court on summary judgment—to decide whether Richards posed an immediate threat to the safety of the officers or others justifying the use of deadly force.

### 3.    *Other Factors*

The Ninth Circuit has recognized that "[o]ther factors, in addition to the three *Graham* factors, may be pertinent in deciding whether a use of force was reasonable under the totality of the circumstances." *S.R. Nehad*, 929 F.3d at 1137. Plaintiff identifies three such factors that may inform the analysis: whether Remington provided warnings before using deadly force, whether less severe alternatives were available, and whether his tactics unreasonably created or escalated the risk of confrontation. *See Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018); *Smith v. City of Hemet*, 395 F.3d 689, 703 (9th Cir. 2005).

It is undisputed that Remington ordered Richards to stop and drop the knife at least once in the Walmart parking lot. (Doc. 89 at 10–11.) It is also undisputed that Richards did not comply with those commands and that Remington did not issue a specific warning that he would shoot if Richards failed to comply. (Doc. 106 at 10.) Courts have emphasized that an officer must warn "whenever practicable" before using deadly force. *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997); *Hayes*, 736 F.3d at 1233. Remington contends that a warning was unnecessary because Richards's conduct created an urgent danger. Plaintiff argues that Richards was moving slowly on a mobility scooter, was surrounded by officers, and had not lunged or attacked, leaving sufficient time to issue a clear ultimatum—such as directing him to drop the knife or advising that he would be shot if he continued. From the record, a jury could reasonably infer that Remington had

1    sufficient time to issue a clear warning but failed to do so, weighing against reasonableness.

2    Conversely, a jury could infer that Remington's repeated commands to stop and drop the

3    knife sufficed under the circumstances, given Richards's refusal to comply and the

4    perceived urgency of the threat.

5           The availability of less-lethal options presents a similar dispute. Plaintiff argues that

6    Remington bypassed less-intrusive means because he did not carry his department-issued

7    pepper spray or baton, and because "Richards was a full 19 feet away from the cashier

8    when Remington shot him." (Doc. 106 at 12–13.) Defendants maintain that Remington

9    could not rely on backup that had not yet arrived and that the immediacy of the threat

10    justified his decision. (Doc. 89, 13.) Courts have recognized that reasonableness may be

11    undermined where less-lethal options are available but not used. *See Glenn v. Washington*

12    *Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011). A jury could therefore infer that Remington acted

13    prematurely by resorting to deadly force when less-lethal options were realistically

14    available. On the other hand, a jury could infer that the narrow timing between Richards's

15    turn toward the Lowe's entrance and the arrival of backup meant that Remington lacked

16    any immediate, effective alternatives, and that his failure to carry other tools did not

17    materially change the calculus in that moment.

18           Remington's tactical choices also bear on reasonableness. *See Vos*, 892 F.3d at 1034

19    (noting tactics leading up to the use of force may be considered). Plaintiff asserts that

20    Remington contributed to the risk by positioning himself in Kardel's line, failing to notify

21    dispatch that Richards was disabled, and failing to coordinate with approaching officers. If

22    credited, a jury could infer that Remington's tactical decisions escalated the confrontation

23    and constrained his available responses, weighing against reasonableness. Alternatively, a

24    jury could infer that Remington's actions reflected split-second judgment under evolving

25    conditions, and that the tactical choices were within the range of reasonable police conduct.

26           Taken together, these additional factors permit competing inferences about whether

27    Remington's conduct was objectively reasonable. Accordingly, it is for the jury—not the

28    Court on summary judgment—to decide whether the absence of a specific warning, the

availability of less-lethal alternatives, and the tactics used prior to the shooting weigh in favor of or against the reasonableness of the force employed.

### 4. Balancing the Factors

Because balancing the government's interests against the intrusion on an individuals' Fourth Amendment rights "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom ... summary judgment or judgment as a matter of law ... should be granted sparingly in cases involving claims of excessive force." *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (internal citation omitted). "Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness." *Scott*, 39 F.3d at 915. Courts must therefore "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Id.*

The material facts are undisputed, but the inferences that may be drawn from those facts diverge sharply. A jury could conclude that Richards's prior conduct created a serious governmental interest in protecting public safety. On that view, Richards's continued possession of the knife and movement toward the Garden Center cashier could make Remington's use of deadly force objectively reasonable. But a jury could equally conclude that, at the moment Remington fired, Richards was not committing a crime, was not fleeing, and did not pose an imminent threat. Both sets of inferences are rational and supported by the record.

The Court does not hold that a reasonable jury must find in Plaintiff's favor, only that it could. As the Ninth Circuit has emphasized, "[t]he question on summary judgment ... is not whether some version of the facts supports [the defendant's] position, but whether a trier of fact, viewing the evidence in the light most favorable to [the plaintiff], could find in [the plaintiff's] favor." *S.R. Nehad*, 929 F.3d at 1133. Because the facts permit competing inferences, the Court "cannot say a verdict in favor of the defendants on the claim for excessive force is the only conclusion that a reasonable jury could reach."

1    *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014). Viewing the evidence and
2    all justifiable inferences in Plaintiff's favor, the Court cannot conclude as a matter of law
3    that Remington's conduct did not violate Richards's Fourth Amendment right to be free
4    from excessive force.

5    C.    Clearly Established Law

6    The Court next considers whether the constitutional right at issue was "clearly
7    established at the time of the violation." *Espinosa v. City & Cnty. of San Francisco*, 598
8    F.3d 528, 532 (9th Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A right is
9    clearly established when it is "sufficiently clear that every reasonable official would have
10   understood that what he is doing violates that right." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).
11   The plaintiff bears the burden to make this showing. *Shafer v. Cnty. of Santa Barbara*, 868
12   F.3d 1110, 1118 (9th Cir. 2017). The inquiry must be conducted "in light of the specific
13   context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12
14   (2015). While a plaintiff need not find a "case directly on point, existing precedent must
15   have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at
16   741. Because this question arises at summary judgment, the Court must view the evidence
17   and all justifiable inferences in the light most favorable to the non-movant. *See Tolan*, 572
18   U.S. at 657.

19   Plaintiff argues that "[i]t was clearly established in November 2021 in the Ninth
20   Circuit that a police officer cannot use lethal force on a person who does not present an
21   imminent threat of death or serious bodily harm to another person." (Doc. 106 at 3.)
22   Plaintiff points to evidence that Richards did not raise or point the knife at Kardel, remained
23   approximately nineteen feet away from her, and was continuing at a steady speed on his
24   scooter without lunging or making sudden movements. (Doc. 106 at 10–13.) Plaintiff
25   contends that from this, a jury could conclude that Richards was not an immediate threat,
26   and therefore, "Remington's decision to use lethal force was obviously unconstitutional."
27   (*Id.* at 17.)

28   Plaintiff relies on several Ninth Circuit cases to support this argument. In *S.R.*

*Nehad*, the court denied qualified immunity where an officer fatally shot a man suspected of threatening a bookstore employee with a knife. 929 F.3d at 1130. When the officer encountered Nehad, he was standing 17 feet away, walking at a steady pace toward the officer, and had not made threatening gestures or verbal threats. *Id.* at 1130–31. The court emphasized that even if Nehad had committed a crime earlier, "he was indisputably not engaged in any such conduct when [the officer] fired his weapon." *Id.* at 1136. A jury here could infer similarity if it credits evidence that Richards was nineteen feet from Kardel, steady in his movement, and not overtly threatening Kardel at the moment of the shooting.

In *Vos*, a mentally ill man entered a 7-Eleven armed with scissors, acted erratically, and briefly grabbed an employee while yelling, "I've got a hostage." 892 F.3d at 1028–29. Officers evacuated the store, took cover outside, and called for backup. *Id.* at 1029. Several officers arrived with K-9 units, "less-lethal" devices, and firearms. *Id.* After a 13–minute standoff, Vos ran out holding scissors above his head. *Id.* He ignored commands to "drop the weapon," and two officers fired four AR-15 rounds, killing him. *Id.* at 1029–30. The Ninth Circuit held that a reasonable jury could find Vos was not an immediate threat, emphasizing that officers had surrounded the store entrance, outnumbered Vos eight to one, had cover, and had less-lethal options available. *Id.* at 1032. A jury could likewise infer here that Remington, who followed Richards for several minutes and knew, just before the shooting, that backup with a beanbag shotgun was arriving, faced circumstances where less-lethal alternatives remained viable.

In *Glenn*, officers confronted a suicidal and intoxicated man holding a pocketknife to his own neck. 673 F.3d at 873–74. When the officers arrived, Glenn was not in a physical altercation, was not threatening others, and bystanders had been moved to safety. *Id.* at 873–74. Glenn did not respond to commands and remained still until officers fired beanbag shotgun rounds. *Id. B*efore the final beanbag was discharged, other officers fired 11 live rounds, striking Glenn eight times. *Id.* at 879. The Ninth Circuit denied qualified immunity, stressing that Glenn was not an immediate threat and that escalating to deadly force so quickly was unwarranted. *Id.* at 873–79. A jury could infer similarly if it finds Richards,

though armed, was not actively threatening Kardel when he was shot, suggesting that the immediacy of danger was less than clear.

In *Estate of Aguirre*, an officer confronted a man destroying property with a bat-like object, after he had threatened a woman with a baby. *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 626 (9th Cir. 2022). The officer confronted the suspect, who refused to drop the stick, and pepper spray was ineffective. *Id.* Witnesses gave conflicting accounts: some said the suspect advanced with another bat, while others said he stood still with the stick lowered. *Id.* The officer fired six shots from about 15 feet away, two striking the suspect in the back. *Id.* at 626–27. The Ninth Circuit denied qualified immunity because factual disputes existed about whether the suspect advanced or remained stationary, and whether he was warned before being shot. *Id.* at 626–28. The court emphasized that uncertainty about the immediacy of the threat precluded summary judgment. *Id.* at 628. Here, video and testimonial evidence permit competing interpretations of whether Richards was actively advancing toward Kardel or merely passing by on his scooter, making the immediacy of any threat uncertain. Moreover, while Remington issued commands for Richards to stop, he did not provide a specific warning that deadly force would be used if Richards failed to comply, despite having time to do so. A jury could therefore infer, as in *Aguirre*, that the absence of such a warning and the ambiguity of Richards's movement preclude resolving the threat assessment as a matter of law.

*Kisela I* and *Kisela II* illustrate how courts may reach different conclusions from similar facts. In *Kisela I*, the Ninth Circuit held that factual disputes about whether a woman holding a knife posed an immediate threat precluded summary judgment. *Hughes v. Kisela*, 862 F.3d 775, 784–785 (9th Cir. 2016), *as amended* (June 27, 2017), *cert. granted, judgment rev'd,* 584 U.S. 100 (2018). In *Kisela II*, the Supreme Court reversed, holding that an officer confronted with an erratic suspect carrying a knife within feet of another civilian was entitled to qualified immunity. *Kisela v. Hughes*, 584 U.S. 100, 105–106 (2018). Depending on what inferences a jury makes, a jury could see Richards's conduct—distant, steady, not lunging—as more akin to *Kisela I*, or, given his prior

brandishing of the knife and movement toward another civilian, closer to *Kisela II*.

Defendants, however, argue that these cases are distinguishable. (Doc. 89 at 10–11). In their view, a jury could instead infer that Richards posed a more immediate threat: unlike *S.R. Nehad*, Richards had recently brandished his knife at a bystander; unlike *Vos*, Remington had not secured the scene and lacked control of the suspect; unlike *Glenn*, Richards was not stationary but was moving in the direction of another civilian; and unlike *Aguirre*, the video evidence shows forward motion toward Kardel. Defendants also rely on *Kisela II*, where the Supreme Court held that shooting a knife-wielding woman within feet of another person who ignored commands was not "an obvious case" of unconstitutional force. 584 U.S. at 105–06. A jury could infer that Richards's actions—turning toward the Lowe's employee after ignoring commands—aligned more closely with the immediacy described in *Kisela II*.

Ninth Circuit precedent therefore permits competing inferences. On one view, the cases support the inference that Richards, although armed, was not an imminent threat at the moment of the shooting and that the use of deadly force was unlawful. On another, the same precedent supports the inference that the immediacy of Richards's threat, when considered alongside his prior conduct and movement toward a civilian, meant the unlawfulness of Remington's actions was not clearly established. Because these determinations hinge on which inference a trier of fact credits, the Court cannot resolve the issue as a matter of law. *See Orn*, 949 F.3d at 1181 ("What [the defendant] most forcefully contests is whether his alternative account of the shooting should be accepted as true. But actual disputes of that order must be resolved by a jury, not by a court adjudicating a motion for summary judgment."). Taken together, these precedents placed the constitutional question "beyond debate." *Ashcroft*, 563 U.S. at 741. Accordingly, the Court denies Remington's Motion for Summary Judgment on the Fourth Amendment excessive force claim (Count I).

D.    The Ninth Shot Was Not Unreasonable As a Matter of Law

Plaintiff moves for partial summary judgment as to the ninth and final shot fired by

Remington. (Doc. 91.) Plaintiff argues that "[n]o reasonable jury could conclude that it was objectively necessary to use lethal force after the first eight shots" because Richards no longer posed a threat. (*Id.* at 9–11.) Plaintiff contends that the approximately one-second pause between the eighth and ninth shots constituted a separate and unreasonable "volley" of gunfire, rendering the final shot excessive as a matter of law. (*Id*. at 10–11.)

Plaintiff relies on *Zion v. Cnty. of Orange*, 874 F.3d 1072 (9th Cir. 2017), asserting that even a brief pause in gunfire requires the conclusion that the threat had ceased. (*Id*. at 11.) *Zion* is distinguishable. In *Zion*, police responded to reports that the suspect had attacked family members with a knife. 874 F.3d at 1075. After the suspect lunged at an officer, another officer fired nine shots from about fifteen feet away, causing the suspect to fall. *Id.* The officer then advanced to within four feet, fired nine additional shots roughly six seconds later, and stomped on the suspect's head three times approximately eight seconds after the second volley. *Id.* The Ninth Circuit emphasized that the second volley and subsequent force occurred after the immediate threat had subsided. *Id.* at 1077–78.

Here, by contrast, the pause between Remington's eighth and ninth shots lasted just over one second. (Doc. 97, Def.'s Ex. C at 00:13.) Unlike in *Zion*, Remington did not advance toward Richards or otherwise reposition himself during that brief interval. (*Id.* at 00:18.) The video shows that Richards remained seated on his motorized scooter when the ninth shot was fired and did not fall to the ground until several seconds later. (*Id.*) The footage does not show whether Remington could have perceived that Richards had dropped the knife or that the threat had ended during the one-second pause. On this record, no evidence supports a finding that Remington had sufficient time to reassess the situation or recognize that the threat had ceased before firing the final shot.

The Court therefore cannot conclude that Remington's one-second pause rendered the ninth shot unreasonable. "It is clear from the very brief time that elapsed that [Remington] made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation." *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1230 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cnty. of*

*San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) (internal quotes omitted). Remington's actions "cannot be found unreasonable because [he] may have failed to perfectly calibrate the amount of force required to protect [Kardel]." *Id.*

Moreover, Plaintiff identifies no authority establishing that a single additional shot fired within one second of an ongoing use of force renders an officer's conduct excessive as a matter of law. Given the rapid sequence of events, the record does not establish a meaningful break or change in circumstances separating the ninth shot from the preceding eight. Accordingly, Plaintiff's motion for partial summary judgment as to the ninth shot is denied.

## IV.    Wrongful Death Claim Under State Law – Count IV

Remington also moves for summary judgment on Plaintiff's state-law wrongful death claim under Ariz. Rev. Stat. Ann. § 12-611. (Doc. 89 at 14–15.) That statute imposes liability when a death is caused by a "wrongful act, neglect or default" that would have entitled the decedent to recover damages had death not occurred. Ariz. Rev. Stat. § 12-611.

Remington argues that the claim fails because his use of deadly force was justified under Arizona law. (Doc. 89 at 14–15.) He relies on Ariz. Rev. Stat. §§ 13-409, 13-410(C), and 13-411(A), which authorize deadly force when an officer reasonably believes it necessary to defend against the use or imminent use of deadly force, as well as § 13-410(C)(1), which provides a justification defense to battery under the same circumstances. Based on these provisions, Remington contends that his actions were objectively reasonable and thus cannot support wrongful death liability. (Doc. 89 at 14.)

In her Response, Plaintiff argues that a reasonable jury could find Remington's use of deadly force unconstitutional, which would defeat any statutory justification or privilege under Arizona law. (Doc. 106 at 17.) In his Reply, Remington maintains that no constitutional violation occurred and further asserts that he is entitled to statutory and common-law qualified immunity under *Spooner v. City of Phoenix*, 246 Ariz. 119, 435 P.3d 462 (Ct. App. 2018). (Doc. 119 at 28.)

Under Arizona law, a wrongful death claim must rest on an underlying tort theory;

the statute does not itself provide an independent theory of liability. *Harris v. City of Phoenix*, 2021 WL 4942662, at *2 (D. Ariz. Oct. 22, 2021), *aff'd*, 2023 WL 6635077. Where the alleged harm arises from an officer's intentional use of force, the claim cannot proceed on a negligence theory. *Liberti v. City of Scottsdale*, 816 F. App'x 89, 90 (9th Cir. 2020) (citing *Ryan v. Napier*, 245 Ariz. 54, 425 P.3d 230 (2018)). In such cases, the proper theory is an intentional tort, such as battery. *See Harris*, 2021 WL 4942662, at *2; *Betancourt v. City of Phoenix*, 2017 WL 5586533, at *4 (Ariz. Ct. App. Nov. 21, 2017). Because Plaintiff alleges that Remington intentionally shot Richards multiple times while he was confined to a wheelchair (Doc. 1 at 17), the Court analyzes the wrongful death claim under an intentional tort theory of battery.

State-law claims arising from an officer's alleged use of excessive force are governed by the same objective reasonableness standard that applies to Fourth Amendment excessive force claims. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 711 (9th Cir. 2017). As explained above, the record permits differing reasonable inferences regarding the threat Richards posed and the necessity of lethal force. A jury crediting Plaintiff's version of those inferences could conclude that Remington's use of deadly force was not objectively reasonable and therefore not justified under Arizona law. Because the evidence supports competing reasonable inferences concerning the justification for Remington's use of deadly force, summary judgment is inappropriate. *See Longoria*, 873 F.3d at 711.

Accordingly, Remington is not entitled to summary judgment on the wrongful death claim. The Court does not decide that Remington's use of force violated Arizona law; it holds only that, on this record, the competing inferences that may be drawn from the evidence must be resolved by a jury.

## V.    ADA and RA Claims – Counts II and III

In Count II, Plaintiff alleges that the City of Tucson ("the City") violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., by failing to provide Richards with a reasonable accommodation during his arrest. (Doc. 1 at 14–15.) In Count III, Plaintiff alleges that the City violated § 504 of the Rehabilitation Act ("RA"),

29 U.S.C. § 701, et seq., on the same basis. (*Id.* at 15–17.)[8]

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 prohibits discrimination "solely by reason of ... disability" in any program receiving federal funds. 29 U.S.C. § 794(a). Because the ADA and Rehabilitation Act are "interpreted coextensively," the Court analyzes these claims together. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021).

A. <u>Legal Standard for ADA and RA Claims</u>

A municipality may be held vicariously liable under Title II when its employees fail to reasonably accommodate a person's disability. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). To establish a violation of Title II, Plaintiff must show: (1) Richards was a qualified individual with a disability; (2) he was either excluded from participation in, denied the benefits of, or otherwise discriminated against by a public entity; and (3) such exclusion, denial, or discrimination occurred "by reason of" his disability. *Id.* at 1141. To recover monetary damages, Plaintiff must show intentional discrimination, meaning that the defendant acted with deliberate indifference. *Id*. at 1138–39.[9]

A public entity's failure to reasonably accommodate a disability during an arrest can constitute discrimination.[10] *Sheehan*, 743 F.3d at 1233. To prevail on such a claim, Plaintiff must demonstrate both (1) the existence of a reasonable accommodation and (2) that the denial of the reasonable accommodation caused Richards "to suffer greater injury

---

[8]    Plaintiff originally pleaded "failure to train" and "failure to conduct a self-evaluation" theories in addition to her "failure to accommodate" theory in Counts II and III. (*See* Doc. 1 at ¶¶ 87, 88, 97, 98.) Plaintiff concedes that those direct liability theories are non-actionable under ADA or RA. (Doc. 104 at 4.)

[9]    Because the Plaintiff has failed to provide evidence that the City of Tucson violated the ADA or RA, the Court need not reach the determination whether she is entitled to monetary damages.

[10]    Courts have recognized two causes of action under Title II of the ADA and § 509 of the RA incident to the arrest of a disabled person: (1) wrongful arrest, where police wrongfully arrest someone because they misperceive the effects of the person's disability as criminal activity; and, as asserted here, (2) failure to provide reasonable accommodation during the arrest. *Sheehan*, 743 F.3d at 1232.

- 30 -

or indignity in [the arrest] process than other arrestees." *Id.* An accommodation is reasonable if it was "necessary to avoid discrimination on the basis of disability" and available and appropriate under the circumstances. *Wong v. Regents of Univ. of California*, 192 F.3d 807, 818 (9th Cir. 1999), *as amended* (Nov. 19, 1999). At summary judgment, a plaintiff bears the initial burden of producing evidence that a reasonable accommodation existed and was denied. *Mayfield v. City of Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025).

B. Type of Proof

The City argues that Plaintiff was required to present expert testimony identifying a disability-specific accommodation. (Doc. 87 at 11–13.) It relies on *Sheehan* and *Ramsey*, where plaintiffs offered expert testimony in support of their proposed accommodations. *Ramsey v. City of Lake Havasu City*, No. CV-20-08189-PCT-DLR (ESW), 2023 WL 6295189 (D. Ariz. Sept. 27, 2023), *aff'd,* No. 23-3244, 2025 WL 66048 (9th Cir. Jan. 10, 2025).

This argument is overbroad. Neither *Sheehan* nor *Ramsey* holds that expert testimony is required to establish the existence of a reasonable accommodation. While expert evidence may strengthen a claim, the law requires only that a plaintiff produce *some* probative evidence that a reasonable accommodation was possible and would have addressed the disability. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (plaintiff bears initial burden of "producing evidence that a reasonable accommodation was possible"); *Wong*, 192 F.3d at 816 (plaintiff must produce evidence "that a reasonable accommodation exists").

C. Analysis

There is no dispute that Title II applies to the City of Tucson and that Richards was a qualified individual with a disability. (Doc. 104 at 4.) The key issue is whether the City, through Officer Remington, failed to reasonably accommodate Richards's mobility impairment.

*1. Plaintiff Provides Evidence of a Reasonable Accommodation*

The City argues that Plaintiff failed to identify any reasonable accommodation that

was both necessary to avoid discrimination and appropriate under the circumstances. (Doc. 87 at 11–13.) It maintains that neither of Plaintiff's proposed actions—using a Taser or employing de-escalation tactics—constituted an accommodation for Richards's mobility impairment. (*Id.*) The City notes that Plaintiff's experts discussed de-escalation only as a general policing tactic, not as a disability-related accommodation, and that neither linked any proposed measure to Richards's physical limitations. (*Id.*) The City maintains that Plaintiff failed to produce admissible evidence showing that a reasonable, disability-specific accommodation existed or was necessary to avoid discrimination. (Doc. 115 at 2–4.) It asserts that *Sheehan*, *Ramsey,* and *Vos* are inapposite because they involved mental-health disabilities, and that the Ninth Circuit has never extended ADA-accommodation requirements to armed encounters involving physically disabled suspects. (*Id.* at 2–3.)

Plaintiff asserts that Remington could have reasonably accommodated Richards's disability during the encounter by de-escalating the situation, informing other officers that Richards was in a wheelchair, or coordinating a nonlethal plan using a Taser, verbal communication, or a flex baton before resorting to deadly force. (Doc. 104 at 6.) Citing *Sheehan* and *Vos*, Plaintiff contends that the reasonableness of an accommodation is a factual question for the jury and that less-lethal alternatives can qualify as reasonable accommodations under the ADA. (*Id.* at 6, 10.) She also asserts that expert testimony is not required to establish a reasonable accommodation, as a jury may assess reasonableness based on the evidence and circumstances. (*Id.* at 10.)

While the City arguments raise legitimate questions about the practical feasibility of Plaintiff's proposed measures, they do not foreclose her claim as a matter of law. The Ninth Circuit has consistently recognized that the reasonableness of an accommodation is "ordinarily a question of fact," not a matter to be resolved at summary judgment. *Sheehan*, 743 F.3d at 1233; *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138–39 (9th Cir. 2001). Viewing the record in the light most favorable to Plaintiff, a reasonable jury could infer that Remington failed to modify his response to account for Richards's mobility impairment—such as by maintaining distance, coordinating with backup, or employing

less-lethal tools—and that such modifications could have reduced Richards's risk of harm. *See Sheehan*, 743 F.3d at 1233 (holding that "failure to provide a reasonable accommodation" in the course of an investigation or arrest may constitute unlawful discrimination under Title II); *see also Updike v. Multnomah Cnty.*, 870 F.3d 939, 951 (9th Cir. 2017) ("The failure to provide reasonable accommodation can constitute discrimination." (simplified)).

At the same time, the evidence could support the opposite conclusion—that Remington acted reasonably under the circumstances and that the proposed measures would not have mitigated the threat perceived. These competing inferences underscore that summary judgment is inappropriate. The Court therefore concludes that Plaintiff has produced sufficient evidence to create a triable issue as to the existence of a reasonable accommodation.

### 2. There is No Evidence of Greater Injury or Indignity

To prevail on a failure-to-accommodate claim, Plaintiff must show not only the existence of a reasonable accommodation but also that the denial of that accommodation caused Richards to suffer greater injury or indignity in the arrest process "by reason of" his disability. *See Sheehan*, 743 F.3d at 1233.

The City argues that Plaintiff has failed to produce any evidence showing that the denial of a reasonable accommodation caused Richards to suffer greater injury or indignity occurred "by reason of" Richards's disability. (Doc. 87 at 13–14.) The City asserts that Remington's use of deadly force was prompted by Richards's conduct—advancing toward a civilian with a knife—rather than by his mobility impairment, and that there is no evidence Remington would have acted differently toward an able-bodied individual in the same circumstances. (*Id.*)

Plaintiff responds that Remington's failure to accommodate Richards's disability caused him to suffer greater injury and indignity than others similarly situated. (Doc. 104 at 8–10.) She argues that Richards could have been safely apprehended and would still be alive had Remington informed other officers that Richards was in a wheelchair, coordinated a tactical plan, or used nonlethal alternatives such as a Taser, verbal de-

1    escalation, or a flex baton. (*Id.* at 6, 10.) Plaintiff further cites a public statement by

2    Remington's attorney—that Remington chose not to use his Taser because Richards was

3    in a wheelchair—as direct evidence that the decision was made "by reason of" Richards's

4    disability. (*Id.* at 9.)

5          This evidence is insufficient to establish the required causal connection. Plaintiff

6    does not show that Remington's actions would have resulted in a lesser injury to an able-

7    bodied arrestee, nor does she demonstrate that Richards's disability increased his risk of

8    harm relative to non-disabled individuals in similar circumstances. Her arguments rest

9    primarily on alleged deviations from standard tactics, rather than on disability-specific

10    risks. She fails to identify any evidence that Richards suffered "greater injury or indignity"

11    *because* of his mobility impairment, as opposed to the general dangers associated with the

12    use of deadly force.

13          Although a jury might infer from the attorney's statement that Richards's

14    wheelchair influenced tactical decisions, that inference alone is insufficient to show that

15    the denial of an accommodation caused Richards's death or increased his risk of harm

16    because of his disability. The ADA and Rehabilitation Act require a causal nexus between

17    the denial of an accommodation and the resulting injury, not merely harm occurring during

18    a police encounter. *See Duvall*, 260 F.3d at 1138–1139. Plaintiff presents no evidence that

19    Remington's conduct was motivated by discriminatory animus or that his failure to

20    communicate or coordinate specifically heightened Richards's risk of harm due to his

21    mobility impairment.

22          Absent proof that Richards's injury was caused by discrimination rather than the

23    use of force itself, no reasonable jury could find that he suffered greater injury or indignity

24    "by reason of" his disability. Accordingly, although Plaintiff raises disputes regarding the

25    feasibility of certain accommodations, she has not presented sufficient evidence from

26    which a reasonable jury could conclude that the denial of those accommodations caused

27    Richards to suffer greater injury or indignity on account of his disability. Without evidence

28    establishing a causal link between Richards's mobility impairment and the harm he

suffered, no reasonable jury could find discrimination "by reason of" disability. Accordingly, the Court will grant summary judgment in favor of the City of Tucson on Counts II and III.

**V.    Conclusion**

For the reasons discussed above, IT IS ORDERED:

1.    Defendant Remington's motion for summary judgment (Doc. 89) is **DENIED**.

2.    Plaintiff's partial motion for summary judgment (Doc. 91) is **DENIED**.

3.    Defendant City of Tucson's motion for summary judgment (Doc. 87) is **GRANTED**. Counts II and III are dismissed.

Dated this 22nd day of December, 2025.

Jennifer G. Zipps
Chief United States District Judge